**Johnnie Lonnie TOMLINSON, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–76–266.**

Court of Criminal Appeals of Oklahoma.

Aug. 30, 1976.

Frank A. Jarmuth, El Reno, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Judge.

Johnnie Lonnie Tomlinson, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Canadian County, Case No. CRF–75–80, for the offense of Shooting with Intent to Kill, in violation of 21 O.S.1971, § 652. His punishment was fixed at twenty (20) years' imprisonment, and from said judgment and sentence a timely appeal has been perfected to this Court.

The evidence presented on trial was substantially the following:

Donald Ray Ables, a service station attendant, testified that on April 8, 1975, at 8:30 p. m., he came in contact with the defendant as the Country Club Drive Service Station on Interstate 40; that he was servicing defendant's automobile when he noticed a pistol laying in the front seat and some rifles in the rear seat. Ables asked the defendant about the guns to which defendant replied that he was running from friends whom he had turned in for pushing drugs.

James Homer Rothrock testified that on the morning of April 9, 1975, he was

standing at the intersection of 22nd and Choctaw in El Reno when he heard some shots come from the direction of I–40; that the shots had a different resonance, with one shot sounding dull, and a few seconds later, a series of rapid shots sounding louder.

Howard Gustafson testified that at 8:15 a. m., on April 9, 1975, he was in the driveway of his home which is located one and a half blocks from I–40; that he saw a Highway Patrol Trooper fall, catch himself and return fire. Gustafson also testified that the first shot sounded dull and the following shots were much louder.

James John Long, a truck driver, testified that on the morning of April 9, 1975, he was traveling west on I–40 when he came upon the scene. He and a partner went over to the highway patrol car and asked Trooper Scherman if he was hurt. Trooper Scherman replied that he had been shot. Long said there was a spot of blood on Scherman's shirt and the defendant was lying face down on the pavement near the left rear corner of his automobile.

The testimony of A. W. Barnett, Long's partner, generally substantiated this account.

Robert Underwood, Jr., an El Reno patrolman who was the first police officer to inspect the scene of the shooting after Trooper Scherman was taken to a hospital, testified that he found a loaded .32 caliber pistol laying in the grass approximately eight feet from the shoulder of the road. Underwood said that the defendant, as he was being placed in the ambulance, asked him, "How is that trooper I shot?"

Don Wallach, an Oklahoma State Bureau of Investigation agent, testified that he conducted a search of the defendant's automobile under color of a search warrant. Over the objection of defense counsel and following an in camera hearing on its admissibility, Wallach testified as to certain evidence removed from the car. He identified the items in State's Exhibit No. 15 (a black and white photograph), as a box of dynamite found in trunk. Wal-

lach further identified State's Exhibits Nos. 17 through 21 as four firearms—"a .12-gauge pump shotgun, a 30-0-6 Springfield rifle, a .22-caliber automatic rifle, and a .16-gauge single shotgun" and a box containing ammunition similar to the ammunition found loaded in the weapons. He said these exhibits also were found in the automobile. In addition, Wallach testified that he removed a fused and capped stick of dynamite from the glove compartment, and approximately thirty sticks of dynamite from the defendant's automobile together with fuses and caps.

Highway Patrol Trooper Mike Grimes testified that he conducted the search with Wallach and generally verified Wallach's testimony.

Lawrence Wilson, a Canadian County Deputy Sheriff, testified that subsequent to reading the defendant his Miranda rights, he tape-recorded an interview with the defendant in his hospital room on April 10, 1975. The recording was played for the jury as State's Exhibit No. 23. In the recorded interview, the defendant admitted having a loaded pistol in the automobile, the rifles and shotguns and the dynamite located throughout the vehicle. The defendant further admitted shooting the trooper as a reflex action after the trooper had shot the defendant twice.

Trooper Scherman, the victim, testified that he first observed the defendant's automobile traveling fast and smoking while he had another vehicle stopped. Subsequently, he clocked the defendant at 80 miles per hour, traveling at a different direction on the interstate. Scherman pursued the defendant for approximately four miles with the patrol car's red light flashing before the defendant pulled over. . This made him suspicious because, he related, most speeders pull over within one-half mile after pursuit begins. In addition, after the defendant stopped, he did not get out of the automobile immediately, but was "messing around" inside. The defendant then got out and walked to the back of the automobile where the trooper was standing, in

such a manner "I couldn't see the front part of his body. . . . When he got back even with the trunk he spun around and he had a pistol . . . , so I went for it and I went for (my gun) and the next thing I felt was when he hit me and I heard the gun go off and then I returned fire. . . . After he hit me I fired three shots and I fell over the guardrail and after I crawled back up the bank and . . . he was still moving and I shot three more (times)." [Tr. 107] The trooper said he then kicked the defendant's pistol out of his reach and called the local police department. Bob Wallach of the El Reno Police Department took the trooper to the hospital.

Jack Smith, an El Reno policeman who was off duty at the time of the shooting, testified that on April 9, 1975, he was outside the emergency room of Parkview Hospital wherein both the defendant and Trooper Scherman were being treated. Smith said the nurse attending the defendant asked him to stand in the emergency room while she went about her work. Smith complied and the defendant asked him, "Hey, man, is that god damn cop dead yet?"

Francis Horn, Parkview Hospital Administrator, identified defense Exhibit No. 1 as a copy of nurse's notes made on the 14th and 16th of April, 1975, but was not allowed to read an entry thereon concerning an attempted suicide by the defendant while he was in the hospital.

The defendant testified that he had never before been arrested; that on the day before the shooting he had a fight with his mother, withdrew approximately $800.00 from the bank and headed for California. He said he took the hand gun on the trip "for the protection of the money." He admitted that the rifles and shotguns found in the automobile belonged to him, but said he had previously placed them in the automobile and "I really didn't think about the other (weapons) being in the car." He also admitted having the dynamite in the automobile, but said that it had been pur-

chased by him and his sister, without the knowledge of their step-father, to blow out stumps on some pasture land. When he began the trip he had forgotten that the dynamite was in the trunk. After he had gotten into Oklahoma, he heard a rattling sound in the trunk and when he investigated it, he discovered the dynamite. In an effort to keep it from moving around in the trunk, the defendant said he put some of the dynamite in the passenger's compartment of the automobile. He had no explanation for why the capped and fused stick of dynamite was in the glove compartment. After he arrived in Oklahoma, the defendant said he became lost and was on Interstate 40 looking for U.S. 66. While driving west on I-40, he saw a station wagon stopped by a Highway Patrol Trooper, who had black hair. Subsequently, after the defendant had turned around and was heading west on I-40, he noticed a patrol car, with an officer who had brown hair, following him. The defendant said he was afraid that the trooper had been overcome by the occupants of the station wagon, who he thought might be trying to pull him over and rob him using the trooper's patrol car. Not knowing if the man was really an officer, the defendant got out of the car with his gun. The defendant testified that he asked the trooper if he was a police officer, that the trooper did not answer, but drew his pistol and began firing at the defendant.

The defendant admitted to having "visions" of his dead father and of being afraid of the dark. He said he had killed his dogs and a horse because he thought they were trying to hurt him. On cross-examination, the defendant said he had not taken any drugs or alcohol for twenty-four hours prior to the shooting.

Gerald Pyle, the defendant's counselor at Richland High School where the defendant was in the eleventh grade, testified that the defendant had a psychological problem manifested by his introverted behavior. Pyle said the defendant, who had not been in trouble at school, was called "Scoobie"

by the other students, but had not been hostile to the other students. The counselor said the defendant's psychological disorders became apparent when he wrote a school paper in his English class (Defense Exhibit No. 2), which begins:

"I feel that I am near madness at times. Hours go by that I don't know what I am doing. Am I going mad or am I really mad? All I want to do at times is hurt things, living things, or to kill people. One day I may kill someone. I can't live with that. . . ."

Dr. Moorman Prosser, an Oklahoma City psychiatrist, testified that he personally examined the defendant on two occasions for a total of forty-five minutes. Prosser said, in his opinion,

"[T]his boy is so mentally ill that he does not have the ability to differentiate between right and wrong. . . .

"[T]his boy was insane and suffered a mental illness, schizophrenic in nature, on April 9, 1975, and before that time. . . ."

The witness also testified that the defendant told him that he had used drugs since about the age of eleven, primarily marijuana, because it made his dead father seem less hostile in the "visions" he had.

During a subsequent hearing in chamber, Dr. Prosser admitted that the defendant "knows that the shooting of a police officer is wrong. . . . [H]e knew it at all times that the shooting of a police officer is wrong. . . . but by nature—by reason of the nature of his mental illness and the imagination or delusions associated with herewith, that he had a fantasy life in which he could imagine that this was not in fact a real officer but in fact a masquerade—someone who was going to rob him."

Howard Pimm, the defendant's step-father, testified that the defendant had visions of his late father, for whose death the defendant had guilt feelings. He added that the defendant was "an exceptionally good boy" who liked to stay at home and was afraid of the dark.

Martha Pimm, the defendant's mother, generally supported Howard Pimm's testimony.

In rebuttal for the State, Loraine Schmidt, Chief of the Forensic Psychiatric Section of the Department of Mental Health, testified that the defendant stayed at her hospital from April 29, 1975 to June 15, 1975. Dr. Schmidt said she interviewed the defendant several times and found that the defendant was not insane or mentally ill on April 9, 1975. She also testified that the defendant had a serious alcohol problem, coupled with the use of marijuana, amphetamines and barbiturates.

On appeal the defense alleges four assignments of error—failure of the trial court to sequester the jury because of extensive publicity; prejudicial evidence of another crime was admitted into evidence which inflamed and outraged the jury; improper instruction; and excessive punishment.

■ In support of the first assignment of error, counsel for defendant refers to this Court's two statutes, 22 O.S.1971, § 853 and 22 O.S.1971, § 857.

Section 853 states:

"The jurors sworn to try an indictment or information, may, at any time before the submission of the cause to the jury, *in the discretion of the court*, be permitted to separate, or to be kept in charge of proper officers. . . ." [Emphasis added]

This Court has consistently held, and continues to hold that:

"[W]hether or not to invoke the rule of sequestration at all is a matter in the discretion of the trial court and not an absolute right of the defendant."

See, *Carson v. State*, Okl.Cr., 529 P.2d 499 (1974); *Thompson v. State*, 73 Okl.Cr. 72, 118 P.2d 269 (1941).

■ In the early case of *Ferguson v. State*, 51 Okl.Cr. 381, 1 P.2d 830 (1931), this Court held:

"It affirmatively appearing from the record that the separation of the jury

occurred prior to the final submission of the cause, such separation was within the discretion of the trial court, and the defendant cannot be heard to complain thereat."

Sequestration of the jury in Oklahoma is well within the discretion of the trial court and without more failure to sequester a jury is not error. However, defendant's counsel argues that because of "the extensive coverage by the press" the trial court's failure to sequester the jury is reversible error which violates "the spirit" of Section 857.

Section 857 states:

"*After hearing the charge*, the jury may either decide in court, or may retire for deliberation. It they do not agree without retiring, one or more officers must be sworn to keep them together in some private and convenient place, and not to permit any person to speak to or communicate with them, nor do so themselves, unless it be by order of the court, or to ask them whether they have agreed upon a verdict, and to return them into court when they have so agreed, or when ordered by the court." [Emphasis added]

This Court has consistently held, as a matter of law, that submission of the cause to the jury at the close of the argument refers to a separation of the jurors after they have been charged by the trial court and after opposing counsels have made their closing statements. See, *Page v. State*, Okl.Cr., 332 P.2d 693 (1958); *Evans v. State*, 26 Okl.Cr. 9, 221 P. 794 (1924). In the instant case the jury did not separate after being charged by the trial court and hearing the closing arguments of counsel.

As to the argument that press coverage of the trial prejudiced the jury and violated "the spirit" of the law, this Court has consistently held that the burden is on the defendant to make a showing that the jury's verdict was influenced by unfavorable press reports. *Glasgow v. State*, Okl. Cr., 370 P.2d 933 (1962). In that case,

this Court held that the burden of showing prejudice from alleged misconduct of a juror by the reading of a newspaper account of the trial before its submission to the jury, is on the defendant. There is no reason to assume, as counsel for the defendant apparently urges, that after a verdict this burden of persuasion shifts to the State. Counsel during trial made several timely, and some not so timely, motions to have the jury sequestered, citing possible prejudice. Each time the trial court overruled the motion and this Court cannot say, from the record before it, that the trial court abused its discretion to the prejudice of the defendant. Each time the trial court recessed or adjourned the trial, it admonished the jurors not to read or listen to accounts of the trial, nor to discuss the case with anyone. This Court will presume that the trial court's instructions were followed in absence of specific evidence to the contrary.

Proof of prejudice may come from the record if it implies that the jury's separation prior to the submission of the case to them, prejudiced the defendant in any way. *Reid v. State*, Okl.Cr., 478 P.2d 988 (1970), modified on other grounds, 507 P.2d 915 (1973). A careful reading of the record and the defendant's appeal brief, fails to disclose any proof of prejudice to the jury by the press coverage. Counsel does not call the Court's attention to any evidence, either in the record or in his brief, to show prejudice as a result of lack of sequestration. He merely states broadly:

"[C]ounsel for the defendant urges that it must be admitted by all that the news, both T.V., radio and printed, of the shooting involved in this case was spread to all in central Oklahoma; certainly to those in Canadian County."

While this might be an argument for a change of venue, this Court fails to see how news coverage of an event which occurred approximately six months prior to the trial, could result in prejudice of a

**804**

non-sequestered jury. In *Welch v. U. S.,* 371 F.2d 287 (10 Cir. 1966), which this Court cited with approval as the law in Oklahoma in *Wilson v. State,* Okl.Cr., 534 P.2d 1325, 1328 (1975), the Appeals Court held:

"To conclude that appellant was denied a fair trial because of the factual reporting . . . requires the application of dual presumptions: that the jurors were both ·exposed to the publicity and *were prejudiced thereby. The law will presume neither* . . .." [Emphasis added]

▮ So that there can be no doubt as to what is decided today, it is now settled that in all cases where jury prejudice is alleged at any stage of trial or appeal the burden of persuasion is on the defendant to show by clear and convincing evidence that (1) the jurors were specifically exposed to media reports which (2) were prejudicial to the defendant. Mere proof that a juror or jury was exposed to factual account of the trial will not meet this burden of persuasion.

▮ The second assignment of error is that the court allowed evidence of other crimes to be admitted, "the only significant purpose of which could have been to inflame and outrage the jury," according to the brief of the defendant's counsel. Specifically, counsel objects to the admission of State's Exhibit No. 15, a black and white photograph of a box containing dynamite removed from the defendant's automobile.

In overruling the defendant's objection, the trial court correctly stated that :

"It seems to me that if it goes to show that he was in the process of violation of a law, or actually in the commission of some other Statutory Probation [sic] that might, if the Jury believes it, go to show motive for this event." [Tr. 56]

The trial court's Instruction No. 5, addressed itself to the issue presented herein:

"You are further advised that it is unlawful for a person to carry loaded pistols, rifles and shotguns in the manner alleged to have been carried by this defendant in this case. You are also advised that it is unlawful to transport the amount of dynamite alleged to have been found in the defendant's vehicle at the time of and immediately following the incident involved in this case.

"In this connection you are advised that when a defendant is put upon trial for one offense he is to be convicted, if at all, by evidence which shows that he is guilty of that offense alone, and the admission of evidence of other crimes, either prior or subsequent to the offense for which he is on trial is usually not admissible. However, evidence of separate offenses is admissible when it is material and proper to show motive or intent.

"Should you find from the evidence beyond a reasonable doubt that such other acts or conduct were in fact committed, then and in that event, you may, if you so elect, consider the same as such evidence may or may not, in your judgment, aid you in determining what, if any, was the motive and intent of this defendant in relation to his acts and conduct on the occasion charged in the Information; and you may consider it for such purpose and such purpose only, and you shall not consider such evidence tending to prove any other acts or conduct than the one charged in the Information as any proof of the particular act charged in the Information."

▮ In a long series of cases, this Court has held, and continues to hold, that evidence of other offenses is generally inadmissible unless it is material or proper to show *motive*, intent, absence of mistake or accident, identity of person charged with commission of crime for which accused is put on trial, or common scheme or plan embracing two or more crimes so related to each other that proof of one tends to establish the other. See, *Worchester v. State,* Okl.Cr., 536 P.2d 995 (1975); *Pruitt*

*v. State*, Okl.Cr., 518 P.2d 1114 (1974); *Lewis v. State*, Okl.Cr., 528 P.2d 741 (1974).

In accordance with the authorities above set forth, we find this assignment of error to be without merit.

■ The third assignment of error is that the court, in giving Instruction No. 7, erred and misdirected the jury. Instruction No. 7 reads:

"You are further instructed that the law of the State of Oklahoma does not recognize the doctrine that one may be so possessed with an uncontrollable impulse or irresistible urge as to compel him to do what he knows to be a wrong and unlawful act, and yet be relieved from all responsibility therefor. A man with ordinary will power, which is not impaired by disease or mental aberration is required by law to govern and control his actions. A shooting arising solely from an uncontrollable impulse or irresistible urge, resulting not from mental lesion but solely from emotional instability, is not insanity."

The defendant's counsel contends that instead of giving a positive instruction of what the law is, the trial court proceeded to entangle the jury in a "verbal morass of what the law is not," citing *Potter v. State,* 93 Okl.Cr. 352, 228 P.2d 204 (1951). In that case, the trial judge instructed the jury that a presumption raised by the State must stand "until it is overcome by the defendant by competent evidence," an erroneous statement of the law. However, this Court recognized that such error was corrected by a subsequent instruction to the extent that it alone was not grounds for reversible error. *Potter v. State*, supra, at 206. The case was reversed and remanded, however, because of an erroneous instruction that assumed a controverted fact in the case, so as to take the issue from the jury. This Court held that a trial court is never "warranted in giving an instruction which has the effect of determining [controverted] questions of fact." *Potter v.*

*State*, supra, at 207. See, *Moody v. State*, 11 Okl.Cr. 471, 148 P. 1055 (1915).

The instruction in the instant case is neither erroneous nor determinative of a controverted fact. The best that the defendant's counsel can argue is that the wording starts "a numeration of what the law does not allow as defenses. This is not a policy which is favored or condoned by the law."

In *Ellington v. State*, Okl.Cr., 462 P.2d 322 (1971), this Court held in the fourth paragraph of the Syllabus:

"All of the instructions given by the trial court should be considered and where they fairly and fully present the issues involved, and no fundamental error occurs whereby the defendant has been prejudiced or deprived of a substantial right, the case will not be reversed on appeal."

Further, in *Turman v. State*, Okl.Cr., 522 P.2d 247 (1974), we held:

". . . It is a well settled rule in Oklahoma that the instructions given to the jury are left to the discretion of the judge, and that such discretion will not be interfered with as long as the instructions, considered as a whole, fairly and correctly state the applicable law. *Barber v. State*, Okl.Cr., 388 P.2d 320 (1963); *Bradshaw v. State*, Okl.Cr., 510 P.2d 972 (1973). . . ."

Considering Instruction No. 7 by itself and in conjunction with the other instructions, we are of the opinion that they fairly and fully state the law and are free of any error which would justify modification or reversal.

■ The fourth assignment of error is that the sentence of twenty years is excessive. As this Court has stated in the past:

"The question of excessive of punishment must be determined by a study of all the facts and circumstances in each particular case, and the Court of Criminal Appeals does not have the power to modify a sentence unless we can conscientiously say that under all facts and circumstances the sentence is so exces-

sive as to shock the conscience of the court."

*Roberts v. State*, Okl.Cr., 473 P.2d 264, citing *LaRue v. State*, Okl.Cr., 404 P.2d 73 (1965). See also, *Poke v. State*, Okl.Cr., 515 P.2d 252 (1973).

The crime for which the defendant was convicted is a serious offense. The evidence clearly shows that the defendant is guilty of the crime beyond a reasonable doubt. Had the officer died, the defendant would have been guilty of Murder in the First Degree. While the defendant's age and emotional problems may have been mitigating factors, these issues were presented to the jurors for their consideration. It was their decision that the defendant suffer the maximum penalty allowed by law for this offense. This Court cannot say, in light of the circumstances and evidence, that the judgment and sentence is so excessive as to shock the conscience of this Court.

For all of the above and foregoing reasons, the judgment and sentence appealed from is, accordingly,

*AFFIRMED.*

BRETT, P. J., and BLISS, J., concur.