No. 82-366

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

THE STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

HENRY JAMES GILLHAM,

Defendant and Appellant.

APPEAL FROM: District Court of the Nineteenth Judicial District,
In and for the County of Lincoln,
The Honorable Robert M. Holter, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Kerry N. Newcomer, Roundup, Montana (argued)
Public Defender

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Chris Tweeten(argued),Asst. Atty. General, Helena
William A. Douglas, County Attorney, Libby, Montana

Submitted: April 26, 1983

Decided: October 6, 1983

Filed: OCT 6 - 1983

*Ethel M. Harrison*

Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Defendant appeals from a conviction of attempted deliberate homicide following jury trial in the Nineteenth Judicial District Court, Lincoln County. We affirm.

Defendant raises the following issues for review:

(1) Did the District Court admit "other crimes" evidence without following required procedures?

(2) Is defendant entitled to a new trial on the basis of juror misconduct?

(3) Did the prosecutor's closing argument violate defendant's right to a fair trial?

(4) Is the conviction based on insufficient evidence?

(5) Did cumulative error deny defendant a fair trial?

On the morning of November 13, 1981, Jean Nordahl notified the Lincoln County Sheriff's Department that he had found a bomb made of several sticks of dynamite and an electrical blasting cap behind the seat of his logging truck near Eureka, Montana. The bomb was removed by ordnance experts from Fort Lewis, Washington, one of whom later testified that had it been wired properly, it would have exploded, destroying the cab of the truck and killing any occupants.

On November 24, 1981, Gillham's daughter, Linda Weitz, and her boyfriend, Michael Darby, contacted the Lincoln County Sheriff's Department and submitted affidavits implicating Gillham in the attempted homicide. The same day, when a search pursuant to a warrant uncovered evidence in Gillham's home, he was arrested. On December 3, 1981, Gillham was charged by information with attempted deliberate homicide, as follows:

> "William A. Douglas, County Attorney of Lincoln County, Montana charges that on the 13th day of November, 1981, at off U.S. Highway #93, South of

2

Eureka, Montana in Lincoln County, Montana the above named Defendant committed the offense of: Attempted Deliberate Homicide, a felony

"The facts constituting the offense are, to-wit:

"-the Defendant, Henry James Gillham, did purposely or knowingly attempt to cause the death of another human being; that is to say, the said Henry James Gillham did purposely or knowingly wire explosives into the truck owned and operated by Jean Nordahl with the purpose to kill Jean Nordahl.
[§§45-4-103; 45-5-102, MCA, 1981]"

Gillham was tried before a jury April 27 through May 1, 1982. The evidence presented at trial indicated that Gillham had made no secret of his plan to earn $5,000 - $10,000 from Jean Nordahl's wife, Carolyn, by blowing up Jean Nordahl with dynamite.

Linda Weitz and Mike Darby both testified that when they first arrived in Eureka from the west coast in September of 1981, Gillham showed them a blasting cap and wires and claimed to have dynamite in his truck. Weitz testified that Gillham told them "he'd gotten into a new business . . . He was going to blow this guy up." Sometime later, after Weitz met Carolyn Nordahl, Gillham identified Mrs. Nordahl as the wife of the man he intended to blow up.

Weitz and Darby lived with Gillham during their first several weeks in Montana. Weitz testified that "[t]his mess with Jean Nordahl, the bombing threats," became a constant topic of conversation around the house. She and Darby feared Gillham and moved into their own house about November 1, 1981.

Weitz and Darby testified that on November 12, 1981 they accompanied Gillham to the Nordahl residence, ostensibly to go "poaching" and deliver some moonshine. Darby and Weitz remained in the car while Gillham went up to the Nordahl house. Through a window, they saw Carolyn Nordahl pass an object to Gillham. Gillham returned carrying a .22 caliber

3

Ruger pistol, which was later found in his home. He told Weitz and Darby he was supposed to shoot Nordahl with the pistol and bury him in a hole behind the house where Weitz and Darby were living. Because Nordahl was not at home, the trio visited elsewhere and returned to the Nordahl residence later that afternoon. Nordahl's logging truck was there. Again Weitz and Darby remained in the car while Gillham entered the Nordahl house. He returned briefly to get the pistol, which he stuck in the waist of his trouser and covered with a jacket, and a jug of moonshine, which he carried into the house. In a few minutes, Gillham, Jean Nordahl and Carolyn Nordahl left the house, where there were a number of guests, and walked into the new shop building. After a few minutes, Carolyn Nordahl emerged from the shop looking "upset or angered." She "smacked a tree" and entered the house. A few minutes later, Jean Nordahl and Gillham left the shop. When Gillham returned to the truck, he told Weitz and Darby that Carolyn Nordahl had wanted him to shoot Jean Nordahl while they were in the shop, as Nordahl leaned over a solvent tank. Gillham refused to do so. The three returned to their homes.

About 10:30 that evening, Weitz and Darby were awakened when Gillham, who was very excited, burst into their house shouting "Get up! Get up! It's time to go!" Gillham ordered Darby to go with him. Weitz and Darby testified they were afraid of Gillham and did not object very strenuously to his order that Darby accompany him.

Darby testified that Gillham drove them to the Nordahl property and parked off the main road out of sight of the house. Carrying a brown paper bag, he proceeded through the woods and entered the back door of Nordahl's shop. Gillham told Darby to stand guard at the front office window, while

4

for about twenty minutes he busied himself by Jean Nordahl's logging truck. At one point, Gillham complained that the bomb was too big and that he had to remove some sticks of dynamite to place the bomb behind the driver's seat. He indicated the wiring was tricky. The bomb was wired to detonate a few seconds after Nordahl turned on the truck headlights. He usually waited to do so until he was outside of the shop. His wife wished to spare the building. Gillham also remarked that he had dropped a piece of wire. Darby located it, tangled around Gillham's feet, and pocketed it. Gillham finished his business with the logging truck and dropped Darby off at his home.

Weitz and Darby testified that when they saw Gillham the next day, he told them "[t]he damn thing didn't go off." According to Weitz, Gillham was extremely worried that his fingerprints on the tape holding the bomb together would give him away. He conducted a number of experiments with tape, egg cartons and mirrors to determine whether he might have left fingerprints. Gillham asked Weitz and Darby to hide the Ruger pistol, a red suitcase containing "some other items," and the fluorescent orange jacket he had worn the night he wired the Nordahl truck. They agreed to hide the items. On November 23, Gillham took back the pistol and jacket but the suitcase could not be found. Both Weitz and Darby feared that Gillham might harm them because they knew too much and were dispensable. At 6:00 a.m., November 24, 1981, they contacted the Sheriff's office and prepared the affidavits which led to Gillham's arrest.

Weitz's and Darby's testimony was far from the only incriminating evidence against Gillham at trial. Jean Nordahl's nineteen-year-old stepdaughter, Sonja, testified that her mother and a "gravelly-voiced man" she identified by

5

voice as Gillham had numerous telephone conversations. They occasionally used her as a telephone relay to transfer details of Jean Nordahl's schedule. She recalled that on September 9, 1981 her mother received a telephone call from the "gravelly-voiced man." Shortly afterword, Sonja accompanied her mother into Eureka, where Carolyn Nordahl slipped a manila envelope into a "gunky, green station wagon" behind the Eureka Cafe and Tavern. Gillham owned an old green Chevrolet station wagon. Two acquaintances of Gillham testified that in the fall of 1981 Gillham had shown them money in a manila envelope. He told them it was $5,000 he was being paid to make someone's husband "come up missing." Jean Nordahl's accountant testified that in late August of 1981 Carolyn Nordahl had written two checks for cash totaling $5,000.

Sonja Nordahl testified that although she had seen and heard her mother, Gillham and a friend of Gillham's discussing Jean Nordahl's murder in the Nordahl home, she never believed they were serious about it. On November 12, 1981, when Gillham was present, Sonja saw her mother carrying the Ruger Bearcat pistol, but Sonja did not see it thereafter. Finally, later that night she telephoned Gillham for her mother and told him "[h]e was supposed to hurry up and get this thing done." Gillham responded that "[Jean Nordahl] wouldn't make it out of the driveway the next morning." The next morning, Sonja called Gillham again. The transcript contains her description of the conversation, as follows:

> "Q. What was the message - or what did you say to him? A. I told him he had made it out of the house fine . . . I told him, '[h]e had left for work fine; that nothing had happened.'

6

Q. What was his response to that? A. He said something like, 'Oh, my God! It should have gone off within fifteen seconds.' "

Sonja did not communicate any of the above information to her stepfather. In fact, according to her testimony, she "hated his guts." But she insisted that she believed the discussions about killing Jean Nordahl were not serious, but were "a pathetic form of comic relief."

Marvin Miller, an employee and friend of Gillham who helped him cut Christmas trees early in the fall, testified that Gillham talked about planning to kill Jean Nordahl "all the time, to everybody." Gillham told Miller in late October "[i]t's all set," and the same day while passing Nordahl's house, he told Miller, "[t]hat is the place." Gillham also told Miller in October that he had already received $5,000 of $10,000 Carolyn Nordahl would pay him for killing Jean Nordahl. On November 13, 1981, after the bombing attempt was discovered, Gillham told Miller, "[t]he bomb didn't go off," and "[i]t was all set." According to Miller, Gillham was "scared to death."

Another daughter of Gillham, Laurel Lyons, testified that she had heard Gillham refer to his "new business," and that he could get paid for "blowing someone away." He showed her dynamite in a suitcase. Lyons recalled Gillham leaving the house with the suitcase, saying he had a job to do. When he returned, Gillham told Lyons he had almost been caught; he "had the hood up and the wires were ready to hook up" when a dog that "should have been penned up" alerted a girl. Gillham said he nearly shot the girl. This evidence was admitted over a continuing objection by defense counsel concerning "other crimes" evidence.

7

Lyons also testified that on November 13, 1981, after the bomb was discovered, Gillham told her, "[y]our daddy fucked up."

Linda Weitz's daughter, Tess Moore, testified that on November 13, 1981, after the bomb was discovered, her grandfather Gillham discussed the matter with her:

> "He just told me that he did it and he didn't want me to think bad about him - about him doing it. And he told me that he was the one that did it - he was the one that set it behind the seat and everything."

On May 1, 1982 the jury returned a verdict of guilty on the charge of attempted deliberate homicide. The District Court sentenced Gillham to sixty years for that crime and an additional ten years for the use of a destructive device. He was designated a dangerous offender. Gillham appeals.

I.

The first issue is whether the District Court admitted evidence of other crimes, acts, or wrongs of the defendant without following required procedures. The trial transcript reflects Gillham's continuous objections to the introduction of evidence which he argued could not be admitted without the procedures mandated by State v. Just (1979), ____ Mont. ____, 602 P.2d 957, 36 St.Rep. 1649. The record establishes that the Just procedural requirements of notice, admonition and instruction were not satisfied. The State does not argue that the Just procedures were followed. It argues that they were not required because the District Court properly characterized the disputed evidence as either (1) acts which were not criminal in nature or (2) acts which were so inextricably related to the crime charged as to be part and parcel of it.

The State argues that acts which are not crimes may be admitted without the procedural safeguards of Just. It is

8

true that a substantial portion of the evidence was not evidence of crimes. This includes evidence that defendant acquainted a significant portion of Eureka's population with his plan to kill Nordahl, that he called and visited the Nordahl home and that he followed Nordahl's vehicle intending to harm Nordahl. But whether the acts are criminal or not does not resolve the issue of the applicability of Just. In State v. Casagranda (1981), ____ Mont. ____, 637 P.2d 826, 829, 38 St.Rep. 2122, 2127, we stated:

> "This general rule, along with the exceptions, has been codified in Rule 404(b), Mont.R.Evid., which states:
>
>> 'Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'
>
> "The important language of this rule overlooked by the State is that the rule is not limited to 'other crimes.' The rule also applies to 'wrongs or acts' of the defendant." (emphasis added)

The fact that the evidence is of non-criminal acts of the defendant does not exempt admission of the evidence from the procedural guidelines established in Just.

This Court has recognized that the State is entitled to "present the entire corpus delecti of the charged offense including matters closely related to the offense and explanatory of it . . .." This rule overrides the requirements of Just. State v. Riley (1982), ____ Mont. ____, 649 P.2d 1273, 1279, 39 St.Rep. 1491, 1499. Riley was a deliberate homicide case where the death of a child followed severe physical abuse by members of a communal group including defendant. Evidence was admitted at trial of a systematic pattern of brutal disciplinary punishment

9

extending over a period of many months before the victim's death. Evidence was also admitted to show a pattern of violence by defendant against other children of the group and by other members of the group against the victim and other children. We held that the evidence provided a context of a continuous series of beatings in which the jury was entitled to view defendant's actions. The evidence was closely related to the offense and explanatory of it.

Evidence that Gillham possessed dynamite and blasting equipment, that Carolyn Nordahl gave him a gun and urged him to shoot Jean Nordahl the evening of November 12, 1981, and that he made an earlier attempt to wire explosives to Nordahl's vehicle fits squarely within the rule articulated in Riley. Each act, whether criminal or not, is inseparably related to the act charged. None of the acts can be characterized as "wholly independent" or unrelated acts. See State v. Trombley (1980), ____ Mont. ____, 620 P.2d 367, 368, 37 St.Rep. 1871, 1873. Likewise, evidence that Gillham told others of his plan to kill Nordahl, that he visited the Nordahl home, and that he followed Nordahl's vehicle intending to harm Nordahl is admissible under Riley as part of the corpus delicti of the crime charged. All of this evidence provides an explanatory context in which the jury was entitled to view the actions of Gillham. The State was entitled to present at trial the entire corpus delicti of the crime charged, including this evidence of acts closely related and explanatory of the crime charged. The District Court did not admit evidence in violation of the Just procedural requirements.

Gillham argues that reversal of his conviction is required by our decision in State v. Gray (1982), ____ Mont. ____, 643 P.2d 233, 39 St.Rep. 622. We do not agree. The

10

facts of Gray are distinguishable from the facts of this case.  In Gray, the District Court admitted evidence of an act committed five days after the crime charged.  Here, none of the disputed evidence is of subsequent acts.  It is evidence of acts inseparable from the crime charged.  Gray does not require reversal of Gillham's conviction.

Although the District Court did not violate Just, we encourage trial courts to apply the safeguards of Just liberally.  Even though the procedures of Just may not be required in a given case, their use may be proper and wise.  Especially in close cases, use of the Just procedures would assure fairness to defendants.  The procedural safeguards were designed to protect those accused of crime from unfair surprise or double punishment.  They should be liberally applied to that end.

## II.

After the jurors returned their verdict, defense counsel polled them regarding their exposure to media coverage of the trial.  One juror had merely glanced at some headlines, but before the defendant's case had been presented, a second juror had read an entire newspaper article which summarized the State's case.  She said she either had not heard or had forgotten the judge's admonition to avoid reading reports of the trial.  The admonition was given the first day of the trial, but not thereafter.  She admitted her mistake in reading the paper, but said the report was accurate and had in no way reinforced her opinions or affected her deliberations.  Defense counsel asked that the jury be held until the accuracy of the article could be verified or, in the alternative, moved for mistrial.  The court denied both requests.

11

Gillham now argues that he is entitled to a new trial because of juror misconduct. He emphasizes that because a unanimous verdict is required for a conviction, the vote of this juror was so critical that the possibility she was prejudiced is sufficient to warrant reversal and retrial.

We agree that where jurors have been exposed to prejudicial and inadmissible outside information which may have influenced their verdict, retrial is in order. In Putro v. Baker (1966), 147 Mont. 139, 410 P.2d 717, we ordered a new trial where, during deliberation in a negligence action arising from an automobile accident, jurors were exposed to inadmissible evidence that defendant had been convicted of manslaughter for deaths arising out of the accident. We stated that where prejudicial outside information was improperly before the jury, prejudice would be rebuttably presumed. We also stated that a juror could not purge himself by merely declaring that such information did not affect his judgment in forming the verdict. Putro, 147 Mont. at 147, 410 P.2d at 721-22. We noted, however, that "[t]he presumption may be rebutted by the use of testimony of the jurors 'to show facts which prove that prejudice or injury did not or could not occur.'" Putro, 147 Mont. at 147, 410 P.2d at 721, citing State v. Jackson (1890), 9 Mont. 508, 522, 24 P. 213, 216.

In this case, the single juror who read the newspaper article testified that it was an accurate and factual report, "about the same" as the admissible testimony already before the jury. As the State correctly observes, there was no evidence before the trial court that the information was prejudicial. Indeed the juror declared that it was not and that it was no more than a factual account of the State's case. Clearly there was juror misconduct but that in itself

12

does not necessitate reversal. As the Oklahoma court stated in <u>Tomlinson v. State</u> (Okla. Crim. App. 1976), 554 P.2d 798, 804:

> "[W]here jury prejudice [by media report exposure] is alleged at any stage of trial or appeal the burden of persuasion is on the defendant to show by clear and convincing evidence that (1) the jurors were specifically exposed to media reports which (2) <u>were prejudicial to the defendant. Mere proof that a juror or jury was exposed to factual account of the trial will not meet this burden of persuasion.</u>" (emphasis added)

We hold that Gillham has not met his burden of establishing the prejudicial nature of the information to which the juror was exposed. The trial court did not err in denying Gillham's request for mistrial. While the trial court was perhaps unnecessarily brusque in releasing the jury before the factual nature of the newspaper account could be verified, it was 2:45 a.m. Defendant could have raised the matter on a motion for new trial if the article had been prejudicial.

We find no error on this issue.

### III.

The remaining three issues are without merit and may be disposed of summarily.

First, in closing argument the prosecuting attorney disparaged a witness whose testimony tended to link Linda Weitz with a plan to kill Jean Nordahl. He referred to the testimony of "a little tootie thirteen-year-old when she was pregnant and coming from a shack with a stepdad with a name of 'Hippie Dave'." He indicated this girl's testimony had been introduced without "second pre-notice" to the State, making it impossible for the State to investigate what relationship existed between "her moonshine-drinking stepdaddy" and "the moonshine-making defendant."

13

Defendant now argues that his right to a fair trial under the United States and Montana Constitutions was jeopardized by these improper remarks of the prosecutor. He argues they must be considered on appeal, pursuant to section 46-X-702, MCA, despite the absence of objection at trial.

We hold that, in light of the entire trial and considering the strength of the State's case, this single statement, concededly outside the boundary of fair comment, did not constitute such a gross abuse as to render the whole trial unfair. Both this Court and the United States Supreme Court have stated that while a defendant is entitled to a fair trial, he is not entitled to a perfect one. United States v. Hastings, No. 81-1463 (U.S. May 23, 1983); Brown v. United States (1973), 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208; State v. Weinberger (1983), _____ Mont. _____, _____ P.2d _____, 40 St.Rep. 844; State v. Powers (1982), _____ Mont. _____, 645 P.2d 1357, 1363, 39 St.Rep. 989, 996. In Hastings, the Supreme Court noted that the harmless error rule "'block[s] setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial' . . .. [I]t is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations . . .." Slip op. at 9, quoting Chapman v. California (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.

Defendant's remaining two arguments, that his conviction must be reversed for insufficient evidence and because of cumulative error, are likewise without merit. The case against him is overwhelming and the alleged errors are technical and insignificant. We find no error which compels reversal.

Affirmed.

14

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices


Mr. Justice Daniel J. Shea, specially concurring:

I join the majority's result, but I do not agree with all that is said.

_____
Justice

15