No. 97-342

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 253

296 Mont. 282

989 P.2d 338

THE STATE OF MONTANA,

Plaintiff and Respondent,

v.

CHRIS LEONARD HANSEN,

Defendant and Appellant.

APPEAL FROM: District Court of the Fourth Judicial District,

In and for the County of Mineral,

The Honorable Ed McLean, Judge presiding.

COUNSEL OF RECORD:

**For Appellant:**

William F. Hooks, Appellate Defender Office, Helena, Montana

**For Respondent:**

Joseph P. Mazurek, Attorney General, Elizabeth Horsman, Assistant Attorney General, Helena, Montana; M. Shaun Donovan, Mineral County Attorney, Superior, Montana

Submitted on Briefs: December 17, 1998

Decided: October 21, 1999

No

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1.Chris Leonard Hansen (Hansen) was convicted by a jury of deliberate homicide in the death of his wife, Nanette Hansen (Nanette). The District Court for the Fourth Judicial District, Mineral County, sentenced Hansen to 60 years in the Montana State Prison and declared him ineligible for parole for 30 years. From this judgment and sentence, Hansen appeals. We affirm.

¶2.Hansen raises the following issue on appeal: Whether the District Court abused its discretion when it admitted evidence of Nanette's out-of-court statements for the purpose of establishing the *corpus delicti*.

## Factual and Procedural Background

¶3.Hansen and Nanette married in 1990 and divorced in late 1991. They continued to live together, however, and, in July 1994, they remarried. They owned 20 acres in a rural setting near De Borgia on which they built a house and barn. Nanette worked as a waitress at Lincoln's Silver Dollar restaurant in Haugan. Hansen had been diagnosed with multiple sclerosis in 1993 and was not employed.

¶4.Scott Abe (Abe), Hansen's son from a previous marriage, had recently reentered his father's life after 23 years of no contact. He had visited his father while on vacation in 1992 and soon thereafter moved in with Hansen and Nanette. Abe eventually moved to a trailer two or three miles from Hansen's property. Abe also worked at Lincoln's Silver Dollar in Haugan until he was injured jumping off a roof.

¶5.On the morning of November 28, 1995, Hansen called the Mineral County Sheriff's Office to report that Nanette had been "stomped" by a horse and was either dead or dying. When the emergency medical team arrived, Nanette was lying face up

in the mud and manure in Hansen's barnyard. She was not breathing, did not have a pulse, and appeared to be dead. Nanette had purportedly left the house that morning to feed the horses, yet, despite the cold weather, she was wearing a light shirt and no jacket. Hansen and Abe were the only other individuals present.

¶6.The emergency medical team began resuscitation efforts on Nanette, but she did not respond or improve. At one point during the resuscitation efforts, air being released from Nanette's lungs made a sound like an exhale or a breath. Hansen asked the emergency medical team if Nanette was breathing. Abe, upon hearing Hansen's question, fell to the ground and hyperventilated. The emergency medical team continued their resuscitation efforts on Nanette until the ambulance arrived and transported her to the Mineral County Community Hospital where she was pronounced dead.

¶7.The State Medical Examiner, Dr. Gary Dale, performed an autopsy on Nanette the following day. He found multiple blunt force and other traumatic injuries to Nanette's head, face, neck, chest, back, arms and legs, yet none of the injuries to Nanette's head were severe enough to have caused her death. Dr. Dale also determined that Nanette's injuries were inconsistent with being trampled by a horse. Because of the pattern injuries on the back of Nanette's head and because Nanette's airways were plugged with mud and other soil-like materials, Dr. Dale determined that Nanette died from asphyxiation and that it was likely she had been forced face down into the mud and held there until she died. Hence, Dr. Dale certified her death as a homicide.

¶8.Deborah Hewitt, a forensic scientist with the State Crime Lab and an expert in fingerprint and other impression evidence, examined the photographs of the pattern injuries on Nanette's scalp and determined they were similar in size and tread design to a pair of boots that had been seized from Abe. Hewitt believed that the evidence was consistent with Dr. Dale's theory and that more than one person was involved in Nanette's death.

¶9.On February 26, 1996, the State charged Hansen and Abe with the offense of deliberate homicide in connection with Nanette's death. Abe's case was eventually severed from Hansen's and Abe was convicted of deliberate homicide by accountability on October 24, 1996. His conviction was affirmed by this Court on August 25, 1998. *State v. Abe*, 1998 MT 206, 290 Mont. 393, 965 P.2d 882.

¶10.On December 19, 1996, the District Court granted leave to the State to file an amended information charging Hansen with deliberate homicide in violation of § 45-5-102(1)(a), MCA, or, alternatively, deliberate homicide by accountability in violation of §§ 45-5-102(1)(a) and 45-2-302, MCA. Thereafter the State filed notice of its intent to offer evidence, pursuant to Rule 404(b), M.R.Evid., of acts of physical abuse alleged to have been committed by Hansen against Nanette. These acts were allegedly committed between the winter of 1992 and the spring of 1993. However, the court cautioned that if the State attempted to introduce such evidence, the door would be open for the defense to bring up Nanette's failure to complain to law enforcement officers about Hansen's conduct. Thereafter, the State withdrew its notice of intent to introduce evidence of other acts and stated it would limit its evidence of such alleged acts to the two-week period preceding Nanette's death.

¶11.In addition, the State disclosed that it intended to introduce at trial evidence of several out-of-court statements allegedly made by Nanette to family members, friends and fellow employees in the two-week period prior to her death. The State contended such evidence was admissible as part of the *corpus delicti* of the charged offenses. Along with statements by Nanette that "something big is going to happen in the next few days" and, if something happened to her, Nanette's friends would know who did it, Nanette's statements pertained to alleged acts of physical violence toward her by Hansen; Nanette's fears relating to the continuation of her relationship with Hansen; Hansen's removal of Nanette's name from their bank accounts and other property; and Nanette's plan to terminate her relationship with Hansen and to leave the area. The State also disclosed that it intended to introduce various out-of-court statements made by Abe in which he expressed anger at Nanette and threatened to kill her.

¶12.Defense counsel objected to the admission of this evidence asserting that not only was it inadmissible hearsay, it was inflammatory and unfairly prejudicial and should be excluded by application of Rule 403, M.R.Evid. The District Court issued an Opinion and Order on January 31, 1997, wherein the court resolved a number of pretrial issues, but reserved ruling on the admissibility of specific statements. The court stated that

> if the sole purpose of statements of the victim which the State wishes to draw from its witnesses is to establish the victim's state of mind, such statements are not relevant. However, if the victim's statements are directly connected to the chain of

events leading up to her death such that they are an inseparable, and vital, part of the *corpus delicti* of the crimes charged, they are not hearsay, and as such, are admissible.

Thus, the court sustained the defense's objection with regard to evidence which goes solely to the state of mind of the victim and overruled the defense's objection as to evidence which is "an inseparable, and vital, part of the *corpus delicti* of the crimes charged." The court determined that any rulings as to which of the two categories specific evidence might fall, must necessarily be reserved for trial.

¶13. On February 3, 1997, the first day of trial, the State tried to introduce Nanette's statements into evidence as part of the *corpus delicti*. The defense objected maintaining that the statements were inadmissible hearsay and not part of the *corpus delicti*. So that the District Court could make specific rulings on the statements, the State broke them down into six types or categories. Over defense counsel's objections, the court ruled that the following four categories of Nanette's statements, as characterized by the State, were admissible: (1) "If anything happens to me, you'll know who did it;" (2) "Something big is going to happen in the next few days;" (3) "He and Scott have taken my name off the house and accounts;" and (4) "This is my home. I'm not going to let them run me off."

¶14. Hence, the State called several witnesses to testify concerning statements made to them by Nanette to the effect that she was afraid of Hansen and Abe; that she was going to leave for a few days with a girlfriend and then leave for good; that Hansen had taken her name off of everything including the bank accounts and the truck; and that she wanted to buy a vehicle in her own name. The jury was instructed that the testimony with regard to these statements attributed to Nanette was not offered to show the truth of the matter asserted. In fact, as the State pointed out, Hansen had not taken Nanette's name off their joint checking account as she had stated. Instead, Hansen had his own name removed from their joint account prior to opening a new account in his and Abe's names.

¶15. Additionally, an employee of the Mineral County Clerk and Recorder's office and a Norwest Bank representative testified about financial changes Hansen made prior to Nanette's death. On October 20, 1995, Hansen removed Nanette's name from the title to their property. However, he did not remove her name from the mortgage to the property held by Norwest. Nanette was the primary borrower on the

mortgage and a credit life policy was issued in her name. When Nanette was killed, the policy paid off the mortgage.

¶16.At trial, Hansen testified that he and Nanette had had serious marital problems and that the situation worsened after the summer of 1995. He also testified that Nanette and Abe had had a disagreement and that this affected his own relationship with Nanette. Hansen further testified that he would not let Nanette drive the truck and that he eventually took Nanette's name off of the title to the truck because he did not want her driving it when she had been drinking, which he claimed she had been doing quite often prior to her death. Hansen testified that he was unhappy with Nanette for not spending enough time with him, for spending too much time in the bars, and for squandering their money. Even so, Hansen asserted that he had not killed Nanette.

¶17.The defense attempted to portray Hansen as frail and incapable of participating in a violent murder. However, Dr. Terry Smith had treated Hansen in 1994 for some loss of vision and later for multiple sclerosis. Dr. Smith also treated Hansen in July 1995, prior to Nanette's death, and determined that Hansen was much improved through the use of medications. Dr. Smith testified that, based upon his prior observations of Hansen and his examination of Hansen in February 1996, Hansen was physically capable of participating in Nanette's murder. In addition, Hansen was videotaped walking and exercising in the Mineral County jail without difficulty. And, despite Hansen's claim that he was nearly blind, he was observed watching television at the jail, playing cards and board games, and filling out his own commissary request sheets.

¶18.On February 8, 1997, the jury convicted Hansen of deliberate homicide. The defense moved for a new trial, based in part on the State's witnesses testifying to hearsay regarding Nanette's state of mind. The court did not formally rule on the motion for a new trial.

¶19.The District Court held a sentencing hearing on March 13, 1997, wherein the court sentenced Hansen to 60 years in the Montana State Prison and declared him ineligible for parole for 30 years. Hansen now appeals his conviction and sentence.

Standard of Review

¶20. The standard of review for evidentiary rulings is whether the district court abused its discretion. *State v. Lantis*, 1998 MT 172, ¶ 52, 289 Mont. 480, ¶ 52, 962 P.2d 1169, ¶ 52 (citing *State v. Gollehon* (1993), 262 Mont. 293, 301, 864 P.2d 1257, 1263). *See also State v. Martinosky*, 1999 MT 122, ¶ 11, 982 P.2d 440, ¶ 11, 56 St.Rep. 495, ¶ 11; *State v. Maier*, 1999 MT 51, ¶ 13, 293 Mont. 403, ¶ 13, 977 P.2d 298, ¶ 13; *State v. Dahlin*, 1998 MT 299, ¶ 32, 292 Mont. 49, ¶ 32, 971 P.2d 763, ¶ 32. The determination of whether evidence is relevant and admissible is left to the sound discretion of the trial judge and will not be overturned absent a showing of abuse of discretion. *Lantis*, ¶ 52 (citing *Gollehon*, 262 Mont. at 301, 864 P.2d at 1263).

## Discussion

¶21. *Whether the District Court abused its discretion when it admitted evidence of Nanette's out-of-court statements for the purpose of establishing the corpus delicti.*

¶22. In its January 31, 1997 Opinion and Order, the District Court determined that Nanette's state of mind was not relevant to the crime charged, thus, testimony by others as to statements made by Nanette in the two weeks prior to her death would not be admissible if offered solely to establish her state of mind. At the same time, the court determined that if the State could establish that the statements went to the *corpus delicti* of the crime charged, then the testimony would not constitute hearsay and would be admissible. Hence, at trial, the District Court allowed the State to admit testimony of statements made by Nanette regarding her fear of Hansen and Abe; her intention to leave for a few days with a girlfriend and then leave for good; her desire to buy a vehicle in her own name; and her belief that Hansen had removed her name from their bank account and from the truck title.

¶23. Hansen contends that the trial court erred on three levels in admitting this evidence. First, because evidence of Nanette's state of mind was not necessary or relevant to establish the *corpus delicti* of the crime charged. Second, because the trial court's designation of evidence as part of the *corpus delicti* of the crime charged does not remove such evidence from application of the hearsay rule. And third, because the prejudicial impact of the evidence outweighed its probative value.

¶34. Hansen maintains that Nanette's out-of-court statements were not part of the

prosecution's proof of the *corpus delicti* of the homicide. To that end, Hansen argues that the doctrine of *corpus delicti* has been expanded beyond its fundamental limits in part because this Court has addressed the unrelated doctrines of *res gestae* and *corpus delicti* as being interchangeable.

¶25.An extensive review of the more than 80 cases in Montana since 1881 that use the phrase *corpus delicti*, as well as the more than 150 cases in Montana that use the phrase *res gestae,* shows that Hansen is correct. Not only has this Court in recent years addressed the unrelated doctrines of *res gestae* and *corpus delicti* as being interchangeable, but, over the years, both concepts have been expanded beyond their fundamental limits and, by doing so, both terms have been misapplied.

¶26.To sort out these confusing bodies of law, we review the prior Montana cases for each concept in turn to determine how the problem started and how it may be remedied. We then discuss how these concepts, in their correct interpretations, apply or do not apply to the case before us on appeal.

## A.

### *Corpus Delicti*

¶27.The concept of *corpus delicti* refers to "the body, foundation or substance of the crime." Black's Law Dictionary 344 (6th ed. 1990). *Corpus delicti* is "the objective proof or substantial fact that a crime has been committed." Black's, at 344.

> Because the phrase "corpus delicti" literally means "body of the crime," people often mistakenly think it only refers to the body in a homicide. A popular misconception has grown up that the police cannot prove a murder unless they find the body. This is not so. Producing the corpse only proves a death, not a crime. Murder has been proven many times by circumstantial evidence of the crime even though the body was lost forever.
>
> In the days of sailing ships, an English murder case (*Rex v. Hindmarsh*, 2 Leach C. C. 569) established a rule that is still followed today. There was an indictment for two counts of murder, one for killing by beating and the other for killing by

drowning. The alleged crime occurred at sea. A witness testified that he was awakened at midnight by a violent noise, that on reaching the deck he saw the accused murderer pick the captain up and throw him overboard, and that the captain was not heard from again. Another witness stated that he had earlier heard the prisoner threaten to kill the captain. Near where the captain had been seen a large piece of wood was found, and the deck and part of the accused's clothing were stained with blood. The defense counsel called for an acquittal because the body was never found, arguing that the captain might have been picked up at sea by a passing ship. The court found sufficient proof of corpus delicti, however, and sent the case to the jury. The jury found the defendant guilty, and he was executed.

. . .

Larceny can be proved without recovering the stolen jewels, kidnapping without finding the victim, England's great train robbery without the million pounds--just as long as the prosecution can prove by other evidence that a crime was committed, that is, the corpus delicti.

Julian R. Hanley & Wayne W. Schmidt, Introduction to Criminal Evidence 9-10 (1982) (hereafter, Hanley).

**¶28.A successful criminal prosecution generally requires proof of three distinct elements: (1) the occurrence of a specific injury or loss (as, in homicide, a person deceased; in arson, a house burned down; in larceny, property missing); (2) that someone is criminally responsible for that loss or injury (in contrast to an accidental occurrence); and (3) the identity of the doer of the crime. 7 Wigmore on Evidence § 2072 (James H. Chadbourn ed., 1978). Wigmore contended that *corpus delicti*, in its orthodox sense, encompassed only the first element, namely, the fact that a specific loss or injury has been sustained. It "warns us to be cautious in convicting, since it may subsequently appear that no one has sustained any loss at all; for example, a man has disappeared, but perhaps he may later reappear alive." Wigmore, § 2072. However, Wigmore points out that most courts also include the second element in the concept of *corpus delicti*, namely, that someone is criminally responsible for the loss or injury. Wigmore, § 2072.**

**¶29.In every criminal case, the burden is on the prosecution to prove the *corpus delicti*, however, the prosecution is not required to prove the identity of the**

perpetrator of the crime as part of the proof of the *corpus delicti*, nor is the identity of the victim required to be proven. "Proof that the defendant was the person who engaged in the unlawful conduct is of course necessary for a conviction, but it is not an element of the corpus delicti." 1 Wharton's Criminal Evidence § 17 (Charles E. Torcia ed., 14th ed. 1985).

¶30.Wigmore emphatically agreed, for he stated that to include the third element, i. e., the accused's identity, is "too absurd indeed to be argued with." Wigmore, § 2072. Moreover, Wigmore stated:

> In a charge of criminal homicide, it is necessary in the first place by full and substantial evidence to establish what is technically called the "corpus delicti,"--the actual offence committed; that is, that the person alleged to be dead is in fact so; that he came to his death by violence and under such circumstances as to exclude the supposition of a death by accident or suicide and warranting the conclusion that such death was inflicted by a human agent; *leaving the question who that guilty agent is to after consideration.*
>
> Wigmore, § 2072 (quoting *Commonwealth v. Webster* (Mass. 1850), Bemis' Rep. 473 (Little & Brown, Boston) (emphasis added). Thus, a "jury cannot deliberate as to who committed [the crime] unless the state first proves that there has been a criminal act." Hanley, at 8.

¶31.Historically, a showing of proof of the *corpus delicti* of a crime was required prior to allowing the introduction of a confession. This doctrine, which dates back to seventeenth and eighteenth century English law, became known as the *corpus delicti rule.* Thomas A. Mullen, *Rule Without Reason: Requiring Independent Proof of the Corpus Delicti as a Condition of Admitting an Extrajudicial Confession* (Winter 1993), 27 U.S.F. L. Rev. 385, 399 (hereafter, Mullen).

> The corpus delicti rule may be seen as a rule of evidence (in that it bars the admission of an extrajudicial confession until a predicate showing is made that the crime charged was committed by someone), and a rule of substantive criminal law (in that it requires a conviction based on a confession to be supported by the requisite degree of proof of the corpus delicti). In both respects, the rule is an anomaly. The rules of evidence generally do not condition the admission of one kind of evidence on the admission of another.

Mullen, at 386-87.

¶32."The main purpose of the corpus delicti rule is to prevent deranged people from being punished for imaginary crimes they claim to have committed." Mullen, at 385. Historians focus on the revulsion in England over unwarranted executions, such as in *Perry's Case* (1660), 14 How. St. Tr. 1311, "as a galvanizing force in the development of the rule." Mullen, at 400. In that case, a suspect confessed to the murder of a man and in his confession, implicated his mother and brother. All three were executed. Later, the alleged victim "materialized with a bizarre story about having been sold into slavery in Turkey." Mullen, at 400.

¶33.In Montana, early criminal cases followed Wigmore's opinion that the *corpus delicti* of a crime included only the first two of the three elements necessary for a successful criminal prosecution, i.e., evidence of the occurrence of a specific injury or loss and evidence that someone was criminally responsible for that loss or injury. *See State v. Pepo* (1900), 23 Mont. 473, 59 P. 721; *State v. Calder* (1900), 23 Mont. 504, 59 P. 903; *State v. Nordall* (1909), 38 Mont. 327, 99 P. 960; *State v. Riggs* (1921), 61 Mont. 25, 201 P. 272; *State v. Smith* (1922), 65 Mont. 458, 211 P. 208; *State v. Kindle* (1924), 71 Mont. 58, 227 P. 65; *State v. Cates* (1934), 97 Mont. 173, 33 P.2d 578. Evidence of the third element, the identity of the doer of the crime, was not part of the *corpus delicti*. "In a prosecution for murder, proof of the *corpus delicti* does not necessarily carry with it the identity of the slain nor of the slayer." *State v. Kindle* (1924), 71 Mont. 58, 64, 227 P. 65, 67. *See also State v. Riggs* (1921), 61 Mont. 25, 52, 201 P. 272, 280-81.

¶34.Additionally, early Montana criminal cases also followed the *corpus delicti rule* holding that there must be evidence, independent of the accused's self-incriminating statements, establishing that the offense charged was actually committed. *See Territory v. Farrell* (1886), 6 Mont. 12, 9 P. 536; *State v. Smith* (1922), 65 Mont. 458, 211 P. 208; *State v. Dixson* (1927), 80 Mont. 181, 260 P. 138; *State v. Clark* (1930), 87 Mont. 416, 288 P. 186; *State v. Traufer* (1939), 109 Mont. 275, 97 P.2d 336; *State v. Ratkovich* (1940), 111 Mont. 19, 105 P.2d 679, *overruled on other grounds by State v. Campbell* (1965), 146 Mont. 251, 405 P.2d 978.

¶35.Eventually, the *corpus delicti rule* outlived its usefulness and the rule was thoroughly disparaged by commentators. "The corpus delicti rule . . . frequently suffers distortions of such magnitude that a want of intellectual honesty must rank

among the costs of maintaining it. The common need to work around the rule to achieve justice suggests that justice would be better served by abandoning the rule." Mullen, at 417. Judge Learned Hand, one of the early detractors of the *corpus delicti rule,* expressed his doubts that the rule "has in fact any substantial necessity in justice. . . ." *Daeche v. United States* (2d Cir. 1918), 250 F. 566, 571.

¶36. In a pair of 1954 decisions, the United States Supreme Court rejected the *corpus delicti rule* in favor of a less stringent requirement for the federal courts. *See Opper v. United States* (1954), 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101; *Smith v. United States* (1954), 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192. In *Opper*, the Supreme Court determined that the corroborative evidence need not be sufficient, independent of the statements, to establish the *corpus delicti*, it is only necessary "to require the Government to introduce substantial independent evidence which would tend to establish the trustworthiness of the statement." *Opper*, 348 U.S. at 93, 75 S.Ct. at 164. Montana, however, continues to use the *corpus delicti rule* in cases of homicide. *See* § 45-5-111, MCA ("before an extrajudicial confession may be admitted into evidence, the state must introduce independent evidence tending to establish the death and the fact that the death was caused by a criminal agency").

¶37. The confusion in Montana with the concept of *corpus delicti* itself, began with this Court's decision in *State v. Jensen* (1969), 153 Mont. 233, 455 P.2d 631. In that case, the defendant was accused of committing lewd and lascivious acts upon one of his chiropractic patients, an underage female. The State, in presenting its case at trial, called several witnesses to testify that defendant also took liberties with other female patients. The defendant argued that it was error to admit this testimony before the State had proven the *corpus delicti* of the crime with which he was charged. *Jensen*, 153 Mont. at 237, 455 P.2d at 633.

¶38. Contrary to prior decisions of this Court, as well as Wigmore and other commentators, the Court in *Jensen* stated that the concept of "*corpus delicti* includes both proof of a crime and proof of *the defendant's* criminality." *Jensen*, 153 Mont. at 237, 455 P.2d at 633 (emphasis added). The Court went on to hold that the witnesses' testimony was admissible as part of the *corpus delicti* to show the defendant's *intent* and that even if it was a technical error to admit this testimony prior to establishing the *corpus delicti*, the error was harmless because the prosecuting witness was eventually put on the stand. *Jensen*, 153 Mont. at 237, 455 P.2d at 633.

¶39.Evidence pertaining to a defendant's intent is not within the proper bounds of the concept of *corpus delicti* because intent relates to a particular defendant's criminality or identity as the perpetrator of the crime. As we previously noted, proof that the defendant was the person who engaged in the unlawful conduct is necessary for a conviction, but it is not an element of the *corpus delicti*. Wharton's, § 17. *See also* Wigmore, § 2072; *Kindle,* 71 Mont. at 64, 227 P. at 67; *Riggs*, 61 Mont. at 52, 201 P. at 280-81. Thus, while the witnesses' testimony in *Jensen* may have been admissible on other grounds, it was error to say that it was admissible as part of the *corpus delicti* of the crime charged.

¶40.In addition, the Court in *Jensen* correctly noted that Montana recognizes the general rule that "when a defendant is put upon trial for one offense, he should be convicted, if at all, by evidence which shows that he is guilty of that offense alone; and evidence which in any manner shows, or tends to show, that he has committed another crime wholly independent, even though it be a crime of the same sort, is irrelevant and inadmissible." *Jensen*, 153 Mont. at 238, 455 P.2d at 633 (citations omitted). The Court reasoned that the defendant is entitled to be informed of the crime charged so as to prepare a defense and proof of other crimes subjects a defendant to surprise and defense of multiple collateral or unrelated issues. *Jensen*, 153 Mont. at 238, 455 P.2d at 633-34 (citation omitted).

¶41.Nevertheless, the Court in *Jensen* recognized several exceptions to this general rule: the similarity of the crimes or acts; the nearness in time of the crimes or acts; and the tendency to establish a common scheme, plan or system. *Jensen*, 153 Mont. at 239, 455 P.2d at 634. After examining the facts in that case, the Court determined that the witnesses' testimony fell within the recognized exceptions to the general rule and that the evidence that defendant also took liberties with other female patients was properly admitted. *Jensen*, 153 Mont. at 239, 455 P.2d at 634.

¶42.Less than three years later, in *State v. Frates* (1972), 160 Mont. 431, 503 P.2d 47, *overruled by State v. Cameron* (1992), 255 Mont. 14, 839 P.2d 1281, this Court compounded the already growing confusion regarding the limited concept of *corpus delicti* by expanding it to include the unrelated concept of other crimes evidence as set forth in *Jensen.* The defendant in *Frates* was accused of selling drugs to an undercover officer. At trial, the State was allowed to offer evidence that during the one-week period prior to that sale, the defendant had twice sold the same type of drugs to an informant. The defendant challenged the admission of this other crimes

evidence. This Court, noting the general rule of inadmissibility of other crimes evidence and the exceptions to that rule as laid out in *Jensen*, affirmed the admission of the other crimes evidence holding that the evidence of the two prior sales of drugs to the informant were part of the *corpus delicti* of the crime with which the defendant was charged. *Frates*, 160 Mont. at 437, 503 P.2d at 50.

¶43.Once again, while the evidence may have been admissible on other grounds, the Court erred by saying that it was admissible as part of the *corpus delicti* of the crime charged. By so doing, the Court incorrectly expanded the concept of *corpus delicti* to include the admission of evidence of other criminal acts committed by a defendant.

¶44.Still later, in *State v. Just* (1979), 184 Mont. 262, 602 P.2d 957, this Court more correctly took the exceptions to the general rule of inadmissibility of other crimes evidence as laid out in *Jensen* and expanded them into what became the *Just* Rule setting forth a four element test to determine the admissibility of evidence of other crimes or acts. These four elements include: (1) similarity of crimes or acts; (2) nearness in time; (3) tendency to establish a common scheme, plan or system; and (4) the probative value of the evidence is not substantially outweighed by the prejudice to the defendant. *Just*, 184 Mont. at 268-69, 602 P.2d at 961.

¶45.Furthermore, the Court in *Just* set forth certain procedures that must be followed before evidence of other crimes or acts may be admitted. First, the defendant must be given notice that evidence of other crimes is to be introduced and the purposes for which such evidence is to be admitted. Second, at the time of the introduction of such evidence, the trial court shall explain to the jury the purpose of the evidence and shall admonish the jury to weigh the evidence only for such purposes. Third, in its final charge, the trial court should instruct the jury that such evidence was received only for the limited purposes earlier stated and that the defendant may not be convicted for any offense except that charged. *Just*, 184 Mont. at 274, 602 P.2d at 963-64.

¶46.The *Just* Rule was later modified to eliminate the limitation that evidence is admissible only if it shows a common scheme, plan or system, and to incorporate the various purposes described in Rule 404(b), M.R.Evid. (proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident). *State v. Matt* (1991), 249 Mont. 136, 142, 814 P.2d 52, 56. In addition, the Modified *Just* Rule, as it became known, included the additional limiting factors set forth in

Rule 403, M.R.Evid, regarding the exclusion of relevant evidence on the grounds of prejudice, confusion, or waste of time. *Matt*, 249 Mont. at 142, 814 P.2d at 56.

¶47.With the implementation of the *Just* Rule and the Modified *Just* Rule dictating specific requirements and procedures for the admission of other crimes evidence, the problems and confusion with the concept of *corpus delicti* were compounded. In many cases to follow, if the other crimes evidence was inadmissible under the *Just* Rule or the Modified *Just* Rule, either because that evidence did not fit within one of the elements of those rules or because the State had not complied with the notice requirement, an attempt was made to admit the evidence under the pretext that it was part of the *corpus delicti* of the crime charged.

¶48.For example, in *State v. Riley* (1982), 199 Mont. 413, 649 P.2d 1273, the defendant was convicted in the beating death of a five-year-old boy whose parents were members of the same religious group to which the defendant belonged. The defendant was a central figure in the enforcement of the group's policy regarding the disciplining of children of the groups' members. This discipline included punishment by beating with a fiberglass stick or electrical cord followed by a cold-water hose down. At defendant's trial, the State introduced evidence that days before the boy's death, the defendant had beaten the boy and at least two other children. *Riley*, 199 Mont. at 425, 649 P.2d at 1279.

¶49.Although the defendant argued on appeal that by allowing this evidence of "other crimes" the trial court failed to adhere to the decisions of this Court in *Just*, the Court did not address the *Just* requirements. Instead, this Court relied on its earlier decision in *Frates* and determined that "the State is entitled to present the entire corpus delicti of the charged offense *including matters closely related to the offense and explanatory of it*, even when such evidence discloses crimes other than those charged." *Riley*, 199 Mont. at 426, 649 P.2d at 1279 (emphasis added).

¶50.While it may not have been incorrect to allow the State to introduce "matters closely related to the offense and explanatory of it," it was incorrect to characterize such evidence as part of the *corpus delicti* of the crime charged. The *corpus delicti* in *Riley* was established by evidence that the boy was dead and that his death was caused by a criminal means. Evidence that the defendant participated in the beatings of the deceased and of several other children, was evidence tending to prove who perpetrated the crime, which, as we have repeatedly stated in this opinion, is not an

element of the concept of *corpus delicti*.

¶51.One year after this Court's decision in *Riley*, the Court once again misapplied the concept of *corpus delicti* to introduce evidence that was not within the proper bounds of that concept and as a means of circumventing the requirements of *Just*. In *State v. Gillham* (1983), 206 Mont. 169, 670 P.2d 544, the State failed to follow the *Just* procedural requirements of notice, admonition and instruction. Nevertheless, the trial court admitted certain evidence under the theory that the evidence was part of the *corpus delicti* of the crime charged.

¶52.The defendant in *Gillham* was convicted of attempted deliberate homicide for placing a bomb behind the seat of his intended victim's logging truck. At trial, the State attempted to introduce evidence that defendant told others of his plan to kill the victim, that defendant had visited the victim's home, and that defendant had followed the victim's vehicle intending to harm him. The trial court determined that this evidence was admissible as part of the *corpus delicti* of the crime charged because it provided an explanatory context in which the jury was entitled to view defendant's actions. Citing *Riley*, this Court stated in *Gillham* that the rule that the State is entitled to present the entire *corpus delicti* of the charged offense including matters closely related to the offense and explanatory of it, "override the requirements of *Just*." *Gillham*, 206 Mont. at 178, 670 P.2d at 549.

¶53.Once again, while the statement that *matters closely related to and explanatory of the charged offense "override the requirements of Just"* may or may not be a correct statement of the law, to characterize evidence that the defendant threatened to kill the victim, visited the victim's home, and followed the victim's vehicle intending to harm him, as part of the *corpus delicti* of the crime charged, was error. The *corpus delicti* in that case was established by showing that a bomb had been placed in the victim's car, thereby establishing that if the victim had met with death in this manner, his death would have been the result of a criminal act and not an accident.

¶54.In numerous cases after this Court's decisions in *Riley* and *Gillham*, the Court continued to follow its inaccurate interpretation of the concept of *corpus delicti* as set forth in those two cases. *See State v. Canon* (1984), 212 Mont. 157, 687 P.2d 705 (evidence that the defendant engaged in numerous drug deals prior to the charged offense of criminal possession of marijuana with intent to sell and that he also threatened underlings with bodily injury if they left his drug organization, was

admitted as part of the *corpus delicti* of the crime charged); *State v. Dawson* (1988), 233 Mont. 345, 761 P.2d 352, *cert denied*, 491 U.S. 910, 109 S.Ct. 3200, 105 L.Ed.2d 708 (1989) (evidence of sexual paraphernalia and magazines seized from defendant's motel room was introduced into evidence as part of the *corpus delicti* of the kidnapping and strangulation deaths of three people even though no sexual crime was charged); *State v. Ungaretti* (1989), 239 Mont. 314, 779 P.2d 923 (evidence of charges pending against defendant in Nevada for the attempted sale of marijuana was admitted as part of the *corpus delicti* of the crime charged in Montana of possession of dangerous drugs with intent to sell); *State v. Wolfe* (1991), 250 Mont. 400, 821 P.2d 339 (the fuses, dynamite and blasting caps seized from defendant's residence several months earlier were admitted as part of the *corpus delicti* of the current crimes charged of possession of explosives and criminal mischief for blowing up a police car). While in each of the four cases cited above, the evidence in question may have been admissible on other grounds, it did not fall within the proper bounds of the concept of *corpus delicti*.

¶55.In contrast, there are two cases decided by this Court during this time period, where the Court correctly interpreted the concept of *corpus delicti*. In the first case, *State v. Howell* (1987), 226 Mont. 148, 734 P.2d 214, the defendant, who was employed as a housekeeper, allegedly stole several items from her employers. These items were eventually discovered in a package, along with various other items, which the defendant had delivered to a UPS shipping center. The State, attempting to introduce these other items into evidence and having failed to provide written notice to the defendant prior to trial that it intended to introduce evidence of "other crimes" in the form of the various items in the package, claimed that the other items were inextricably or inseparably linked with the crime charged as part of the *corpus delicti*. This Court disagreed and determined that such evidence was wholly independent of the crime charged and since the State failed to provide notice pursuant to *Just*, the State was prohibited from introducing the evidence. *Howell*, 226 Mont. at 151, 734 P.2d at 216.

¶56.In the second case, *State v. Davis* (1992), 253 Mont. 50, 830 P.2d 1309, the defendant was charged with sexual assault of a child. While he was incarcerated awaiting trial, defendant asked one of his friends to retrieve a parcel from defendant's home and destroy it. Instead, the friend opened the parcel and found several nude photographs of another child which the friend turned over to the sheriff's department. Consequently, the information against the defendant was

amended to include a charge of solicitation of tampering with physical evidence. At trial, the State introduced evidence of the sexual assault charges pending against defendant in another county involving the child in the photographs. On appeal, this Court correctly determined that this evidence was part of the *corpus delicti* of the evidence tampering charge because evidence tampering requires a showing that the person believes that an official proceeding or investigation is pending (hence the admission into evidence of the charges pending in another county) and that the person attempts to alter or destroy documents or other evidence. *Davis*, 253 Mont. at 59-60, 830 P.2d at 1315-16.

¶57. Nevertheless, it was not until *State v. Cameron* (1992), 255 Mont. 14, 839 P.2d 1281, that this Court took the opportunity to reexamine a few of its prior holdings involving the concept of *corpus delicti*. However, the Court in *Cameron* did not delve into the definitions and the historical background of the concept of *corpus delicti* and, thus, missed the opportunity to straighten out this line of case law once and for all.

¶58. The defendant in *Cameron* was charged with criminal sale of dangerous drugs. At trial, the District Court allowed the State to introduce evidence that defendant had threatened a witness with a firearm two or three months prior to the charged act as well as evidence of another drug sale that had taken place the day before the charged act. On appeal, this Court determined that the gun-threat evidence was not admissible under the Modified *Just* Rule as the State failed to give written notice specifying the evidence to be admitted and there was no similarity between the alleged gun threat and the charged crime of criminal sale of dangerous drugs. *Cameron*, 255 Mont. at 18-19, 839 P.2d at 1284-85.

¶59. The Court further determined that the District Court erred in allowing the State to introduce evidence of the prior drug sale as part of the *corpus delicti* of the crime charged.

> In so holding, the Court specifically overruled *Frates* (discussed earlier in this opinion as one of the early cases misinterpreting the concept of *corpus delicti*). The Court in *Frates* had admitted evidence of a prior drug sale under the concept of *corpus delicti* holding that the two crimes were so related that proof of one tended to establish the other. *Frates*, 160 Mont. at 437, 503 P.2d at 50-51. The Court in *Cameron* examined *Frates* and other similar cases, and determined that the correct rule was as previously set forth in *State v. Christensen* (1990), 244 Mont. 312, 797

P.2d 893, that "the similarity of crimes is not the test of whether they fall within the same corpus delicti." *Christensen*, 244 Mont. at 320, 797 P.2d at 898. Hence, the *Cameron* Court overruled *Frates* and held that evidence of a prior drug sale is not admissible as part of the *corpus delicti* of the crime charged. *Cameron*, 255 Mont. at 22, 839 P.2d at 1287.

**¶60.Although by overruling *Frates*, the Court made a start in the right direction in *Cameron*, it did not go far enough to correct the misinterpretation and misapplication of the concept of *corpus delicti*. This is borne out by this Court's determination in *State v. Hage* (1993), 258 Mont. 498, 853 P.2d 1251, a case decided less than eight months after *Cameron*, wherein the Court relied in part on *Frates* to admit evidence of defendant's state of mind as part of the *corpus delicti* of the crime charged.**

**¶61.The defendant in *Hage* was charged with deliberate homicide. At trial, the District Court allowed the State to introduce evidence that on the night of the murder, defendant was waving a gun around and threatened to kill someone other than the deceased. The State claimed that these acts showed defendant's state of mind and were thus relevant to the crime. This Court, citing *Riley, Frates*, and *Gillham* for their conclusion that the State is entitled to present the entire *corpus delicti* of the charged offense even when such evidence discloses crimes other than those charged, held that defendant's statements and actions prior to the crime are relevant to defendant's state of mind and to the crime charged. *Hage*, 258 Mont. at 506-07, 853 P.2d at 1256.**

**¶62.While the evidence objected to in *Hage* may have been admissible as determined by the Court, it was error to characterize that evidence as part of the *corpus delicti* of the crime charged. As we have explained numerous times throughout this opinion, evidence of a defendant's state of mind does not fall within the bounds of the concept of *corpus delicti* since that evidence goes instead to prove the identity of the perpetrator of the crime.**

**¶63.The same is true as to proof of ownership of the weapon involved in the crime. In *State v. Byers* (1993), 261 Mont. 17, 861 P.2d 860, *cert denied*, 511 U.S. 1009, 114 S.Ct. 1380, 128 L.Ed.2d 55 (1994), *overruled on other grounds by State v. Rothacher* (1995), 272 Mont. 303, 901 P.2d 82, and *State v. Egelhoff* (1995), 272 Mont. 114, 900 P.2d 260, a defendant charged with killing two Montana State University students objected to**

the State introducing evidence, without a *Just* notice, that the length of the shotgun used in the commission of the crime was in violation of federal regulations. This Court determined that the evidence was admissible as part of the *corpus delicti* of the crime charged and did not require the giving of a *Just* notice. *Byers*, 261 Mont. at 35, 861 P.2d at 871.

¶64.While the shotgun itself was admissible under the concept of *corpus delicti* to show that death resulted from a criminal agency, the fact that the shotgun was illegally short was used to prove the ownership of the weapon and, thus, who perpetrated the crime. Consequently, that evidence does not fall within the bounds of the concept of *corpus delicti*. That is not to say, however, that the evidence was not admissible on other grounds.

¶65.Although the list of cases wherein the Court incorrectly interpreted the concept of *corpus delicti* is lengthy, there are, as shown earlier in this opinion, occasional exceptions. Such is the situation in two very recent decisions where the evidence did indeed fall within the proper bounds of the concept of *corpus delicti*.

¶66.In *State v. Langford* (1994), 267 Mont. 95, 882 P.2d 490, *cert denied*, 513 U.S. 1163, 115 S.Ct. 1128, 130 L.Ed. 2d 1090 (1995), the defendant, an inmate at the Montana State Prison, was charged with burglary and deliberate homicide for events occurring during the 1991 riot in the maximum security unit at the prison. At defendant's trial on these charges, the District Court permitted the State to introduce evidence of an incident during an attempt to quell the riot wherein defendant, in refusing to comply with an officer's order to get on the ground, moved defiantly toward the officer and the officer was compelled to fire a warning shot in defendant's direction. *Langford*, 267 Mont. at 98, 882 P.2d at 491-92. On appeal, the State asserted that this evidence was admissible as part of the *corpus delicti* of the crime of burglary and this Court agreed. In this instance, the Court was correct in its conclusion that the evidence was admissible as part of the *corpus delicti,* but incorrect in part of its analysis.

¶67.A charge of burglary is based on an allegation that an individual knowingly entered or remained unlawfully in an occupied structure with the purpose to commit an offense. Section 45-6-204(1), MCA. Thus, to establish the *corpus delicti* of the charge of burglary in this case, the State had to introduce evidence to establish that someone had entered or remained unlawfully in D Block of the maximum security

unit with the purpose to commit the offense of riot, i.e., to disturb the peace by engaging in an act of violence or threatening to commit an act of violence as part of an assemblage of five or more persons. Section 45-8-103(1), MCA. Evidence of the officer's act of firing a warning shot at defendant was admissible as part of the *corpus delicti* to show that the officer believed he was being threatened with violence.

¶68. In making this determination, however, the Court relied, in part, on *Hage* to hold that the evidence in *Langford* went to that defendant's state of mind in the same way that the evidence in *Hage* went to the state of mind of the defendant in that case. As we stated in our analysis of *Hage* in this opinion, a defendant's state of mind does not fall within the proper bounds of the concept of *corpus delicti*. Nevertheless, this Court also relied on Rules 403 and 404(b), M.R.Evid., clearer and more precise statements of the law regarding admissibility of evidence, in making its determination that the evidence was part of the *corpus delicti* of the crime charged.

¶69. Similarly, in *State v. Monaco* (1996), 277 Mont. 221, 921 P.2d 863, evidence that defendant had filed allegedly fraudulent workers' compensation claims in both Florida and Wyoming was part of the *corpus delicti* of the crime of felony theft for which defendant was charged in Montana. In that case, the defendant, while filling out a workers' compensation claim with the State Fund, declared that he had not made any prior claims. In order to establish that a loss or injury had occurred and that someone was criminally responsible for that loss or injury, i.e., the elements of *corpus delicti*, it was necessary for the State to introduce evidence of the Florida and Wyoming claims to show that the defendant's statement was false, thus, theft by deception was committed. *Monaco*, 277 Mont. at 226, 921 P.2d at 866.

¶70. With all this in mind, we turn then to the case before us on appeal. In Hansen's case, the State had already established the *corpus delicti,* without introducing Nanette's statements, by presenting evidence that Nanette was dead and that her death was caused by criminal means. These elements were established by the testimony of the emergency medical team, the hospital staff who pronounced Nanette dead, and by Dr. Dale, the pathologist, who testified that Nanette's death was a homicide and was not caused accidentally or as a result of being trampled by a horse.

¶71. Testimony regarding Nanette's statements about her plans to leave Hansen, her fear of him, his removing her name from marital property, and references to future occurrences do not fall within the proper bounds of the concept of *corpus delicti*

because they tend to establish the perpetrator of the crime, which, as we have stated enumerable times in this opinion, is not an element of the *corpus delicti*. Hence, these statements by Nanette were improperly admitted under the theory that they were part of the *corpus delicti* of the crime of deliberate homicide.

## B.

### *Res Gestae*

¶72.Although the District Court did not discuss the concept of *res gestae* in admitting Nanette's statements, nor did it admit the statements under that theory, Hansen argues that the statements would not be admissible under the concept of *res gestae* any more than they were admissible under the concept of *corpus delicti*. We agree.

¶73.*Res gestae* generally refers to spontaneous declarations that are so closely connected to an occurrence that they are considered part of the occurrence. "The 'res gestae' rule is that where a remark is made spontaneously and concurrently with an affray, collision or the like, it carries with it inherently a degree of credibility and will be admissible because of its spontaneous nature." Black's, at 1305. "The rule is extended to include, not only declarations by the parties to the suit, but includes statements made by bystanders and strangers, under certain circumstances." Black's, at 1305. It is a "spontaneous declaration made by a person immediately after an event and before the mind has an opportunity to conjure a falsehood." Black's, at 1305.

¶74."The term *res gestae* seems to have come into common usage in discussions of admissibility of statements accompanying material acts or situations in the early 1800's."

McCormick on Evidence § 268 (John W. Strong ed., 4th ed. 1992). For the most part, *res gestae* refers to statements made

> immediately before, during, or immediately after the commission of a crime, by the accused, victim, or a bystander, as a spontaneous reaction or utterance stimulated by the excitement of the occasion, and made under such circumstances as to preclude contrivance or fabrication. In short, the basic theory which supports this exception to the hearsay rule is that the circumstances under which a res gestae statement is

made stand as a guaranty of the statement's truthfulness. Thus, a witness may testify that the deceased came to her door and said, "Call the police. My wife stabbed me." Testimony as to a res gestae statement may be given in court by the declarant himself or by a person who heard such statement.

2 Wharton's Criminal Evidence § 288 (Charles E. Torcia ed., 14th ed. 1986).

**¶75.Today these statements fall into four specific exceptions to the hearsay rule: (1) statements of present sense impressions, (2) excited utterances, (3) statements of present bodily condition, and (4) statements of present mental states and emotions. These four exceptions are found in Rule 803, M.R.Evid. Cases in Montana following this definition of the concept of *res gestae* include: *Phillip R. Morrow, Inc. v. FBS Ins.* (1989), 236 Mont. 394, 770 P.2d 859; *State v. Pendergrass* (1978), 179 Mont. 106, 586 P.2d 691; *State v. Bradford* (1978), 175 Mont. 545, 575 P.2d 83; *State v. Caryl* (1975), 168 Mont. 414, 543 P.2d 389; *State v. Deshner* (1971), 158 Mont. 188, 489 P.2d 1290; *State v. Medicine Bull* (1968), 152 Mont. 34, 445 P.2d 916; *Blevins v. Weaver Constr. Co.* (1967), 150 Mont. 158, 432 P.2d 378; *State v. Shambo* (1958), 133 Mont. 305, 322 P.2d 657; *Koppang v. Sevier* (1938), 106 Mont. 79, 75 P.2d 790; *Sullivan v. Metropolitan Life Ins. Co.* (1934), 96 Mont. 254, 29 P.2d 1046, *overruled on other grounds by Life Ins. Co. of North America v. Evans* (1981), 195 Mont. 242, 637 P.2d 806; *State v. Le Duc* (1931), 89 Mont. 545, 300 P. 919; *Poindexter & Orr Live Stock Co. v. Oregon Short Line R. Co.* (1905), 33 Mont. 338, 83 P. 886; *State v. Biggerstaff* (1896), 17 Mont. 510, 43 P. 709; *State v. King* (1890), 9 Mont. 445, 24 P. 265; *Territory v. Campbell* (1889), 9 Mont. 16, 22 P. 121; *Territory v. Clayton* (1888), 8 Mont. 1, 19 P. 293.**

**¶76.The concept of *res gestae* has not always been associated only with spontaneous declarations.**

In some states, res gestae is given an even broader scope to include not only a spontaneous utterance made before, during, or after the commission of a crime, but also real or demonstrative evidence relevant to the crime charged, such as the torn dress of a prosecutrix to show that she had been raped; testimony by a police officer or other witness as to what he heard or observed before, during, or after the commission of the crime; all that occurred at the time and place of the crime, or immediately before or after the crime if causally related thereto; a declaration of intent by the victim; a statement, confession, or admission by the defendant; or a

declaration or conduct of a coconspirator or accomplice.

Wharton's, § 288.

**¶77. Such is the case in Montana where the concept of *res gestae* has also been associated with the "transaction rule," which provides:**

> **Declaration, act, or omission which is a part of the transaction.** Where the declaration, act, or omission forms part of a transaction which is itself the fact in dispute or evidence of that fact, such declaration, act, or omission is evidence as part of the transaction.

Section 26-1-103, MCA. Cases in Montana following this definition of the concept of *res gestae* include: *State v. Wing* (1994), 264 Mont. 215, 870 P.2d 1368; *State v. Moore* (1992), 254 Mont. 241, 836 P.2d 604; *Carl Weissman & Sons v. St. Paul Fire & Marine Ins. Co.* (1968), 152 Mont. 291, 448 P.2d 740; *State v. Gilbert* (1951), 125 Mont. 104, 232 P.2d 338; *State v. Russell* (1933), 93 Mont. 334, 18 P.2d 611; *State v. McCracken* (1933), 93 Mont. 269, 18 P.2d 302; *State v. Schlaps* (1927), 78 Mont. 560, 254 P. 858; *State v. Willette* (1912), 46 Mont. 326, 127 P. 1013, *overruled on other grounds by State v. Greeno* (1959), 135 Mont. 580, 342 P.2d 1052; *State v. Crean* (1911), 43 Mont. 47, 114 P. 603; *Finch v. Kent* (1900), 24 Mont. 268, 61 P. 653; *Watson v. O'Neill* (1894), 14 Mont. 197, 35 P. 1064; *Ryan v. Dunphy* (1882), 4 Mont. 356, 5 P. 324.

**¶78. The Federal Rules of Evidence avoid using the term *res gestae*. The phrase is too vague and, therefore, it has been disparaged by judges and commentators alike.**

> As employed in the common law, res gestae is so broadly and loosely defined that its main thrust is simply to forestall rational analysis as to the admissibility of a particular statement challenged as hearsay. The "phrase is used only because the courts insist on retaining it in spite of condemnation by text- writers and most distinguished judges."

Michael H. Graham, Evidence: Text, Rules, Illustrations and Problems 279-80 (1983) (hereafter, Graham) (quoting Edmund M. Morgan, Basic Problems of Evidence 328 (1961).

**¶79. One judge complained about the use of the term *res gestae* saying, "Definitions of**

the term 'res gestae' are as numerous as the various cures for rheumatism and about as useful." Hanley, at 189 (quoting *Coryell v. Reid* (1931), 117 Cal. App. 534 (Hauser, J., dissenting)). Not to be outdone, Judge Learned Hand characterized the term *res gestae* as follows: "[A]nd as for 'res gestae' . . . if it means anything but an unwillingness to think at all, what it covers cannot be put in less intelligible terms." Graham, at 280 (quoting *United States v. Matot* (2d Cir. 1944), 146 F.2d 197, 198). Justice Oliver Wendell Holmes emphatically agreed with the number of judges and commentators disparaging the use of the phrase *res gestae*. He stated that: "The man that uses that phrase shows that he has lost temporarily all power of analyzing ideas." Graham, at 280.

¶80. Wigmore has characterized the term *res gestae* as useless and harmful:

> The phrase res gestae has long been not only entirely useless, but even positively harmful. It is useless, because every rule of evidence to which it has ever been applied exists as a part of some other well-established principle and can be explained in the terms of that principle. It is harmful, because by its ambiguity it invites the confusion of one rule with another and thus creates uncertainty as to the limitations of both. It ought therefore wholly to be repudiated as a vicious element in our legal phraseology. No rule of evidence can be created or applied by the mere muttering of a shibboleth. There are words enough to describe the rules of evidence. Even if there were no accepted name for one or another doctrine, any name would be preferable to an empty phrase so encouraging to looseness of thinking and uncertainty of decision.

6 Wigmore on Evidence § 1767 (James H. Chadbourn ed., 1976). And, McCormick has characterized the term *res gestae* as confusing:

> The marvelous capacity of a Latin phrase to serve as a substitute for reasoning, and the confusion of thought inevitably accompanying the use of inaccurate terminology, are nowhere better illustrated than in the decisions dealing with the admissibility of evidence as "res gestae."

McCormick, § 268 n.6 (quoting Edmund M. Morgan, *A Suggested Classification of Utterances Admissible as Res Gestae* (1922), 31 Yale L.J. 229, 229).

¶81. The phrase *res gestae*, in itself, adds nothing but confusion to an already complex

area of the law. The better practice is to abandon the use of the phrase altogether and to, instead, use the specific rule of evidence or statute that applies to the particular factual situation presented.

**¶82.In the case before us on appeal, Nanette's statements do not fit within the traditional definitions of the concept of *res gestae,* because these statements were made several days before her death.**

> A declaration made by a homicide victim immediately before the act of homicide is ordinarily admissible as part of the res gestae. Declarations have also been held to be admissible as part of the res gestae even though made a few minutes . . . or several hours, before the act of homicide. However, declarations will ordinarily not be regarded as part of the res gestae where the time interval between the declaration and the act of homicide is several days . . . .

Wharton's, § 290. For that same reason, Nanette's statements also do not fit within the specific rules of evidence governing such statements.

> (1) Present sense impression. A statement describing or explaining an event or condition *made while the declarant was perceiving the event or condition*, or immediately thereafter.

> (2) Excited utterance. A statement relating to a startling event or condition *made while the declarant was under the stress of excitement caused by the event or condition*.

Rule 803, M.R.Evid. (emphasis added).

**¶83.Accordingly, to admit Nanette's statements under the concept of *res gestae* would have been error.**

**¶84.There is one other problem with the concepts of *res gestae* and *corpus delicti* that requires this Court's attention. In at least three instances, *State v. Hayworth*, 1998 MT 158, 289 Mont. 433, 964 P.2d 1, *State v. Eichenlaub* (1995), 272 Mont. 332, 901 P.2d 90, and *State v. Moore* (1992), 254 Mont. 241, 836 P.2d 604, this Court has incorrectly referred to certain evidence as being "part of the *res gestae* or *corpus delicti* of the crime" implying that the two terms are interchangeable. They are not**

**and should not be referred to as such.**

## C.

### *Harmless error*

The State argues that even if the trial court erred in the use of the terms *corpus delicti* and *res gestae*, "so what;" there was substantial evidence without Nanette's statements to uphold the verdict of guilty of deliberate homicide. Although we disagree with the State's terminology, we agree that the admission of Nanette's statements was merely cumulative and constituted harmless error.

**¶85.Cumulative evidence is "additional evidence of the same character to the same point."** *State v. Stuit* **(1996), 277 Mont. 227, 233, 921 P.2d 866, 870; § 26-1-102(4), MCA. This Court has stated that "[a]n error by the trial court will be deemed harmless 'unless the record shows that the error was prejudicial.'"** *State v. Carter* **(1997), 285 Mont. 449, 459, 948 P.2d 1173, 1178-79 (citing** *State v. Bower* **(1992), 254 Mont. 1, 5-6, 833 P.2d 1106, 1109 (quoting § 46-20-701(1), MCA)). In determining the prejudicial effect of an error, we examine the totality of circumstances in which the error occurred.** *Carter***, 285 Mont. at 459, 948 P.2d at 1179 (citations omitted).**

**¶86.The evidence presented at trial established that no person or persons, other than Hansen and Abe, were present either immediately before or at the time of Nanette's death.**

In addition, Abe claimed to have given Nanette mouth-to-mouth resuscitation upon finding her lying face down in the mud, however, no traces of mud were found on his face or mouth. Instead, a mark matching the tread of Abe's boot was found on Nanette's head.

**¶87.It was also established at trial that Hansen was not as frail as he claimed to be. Two days after Nanette was killed, Hansen was observed standing in the bucket of a tractor and assessing the barn loft. Hansen was also videotaped walking and exercising without difficulty in the Mineral County jail.**

**¶88.Furthermore, both the Mineral County Sheriff and the Undersheriff testified that, a day or two after Nanette's death, they asked Hansen to remove his shirt so they could look for marks on his body. They testified that they found recent four- to**

six-inch long scratches on his chest and shoulder. Hansen first told them that he received the marks when he tripped over a lamp and broke it, then he said he tripped over a table with a plant on it, then he said he might have received the marks from a bedroom or bathroom doorjamb where he may have tripped the previous evening after coming home from the bar. Hansen also made inconsistent statements regarding the events of both the morning Nanette was killed and the prior evening, including the time when Nanette arrived home, the time she went to feed the horses, the time Hansen called Abe, and the time Nanette was found and by whom.

¶89. There was also a considerable amount of testimony introduced at trial regarding statements both Hansen and Abe themselves had made regarding Nanette both prior to and after her death. For example, Robert Finley, one of Hansen's neighbors, had visited the Hansens a couple of times a week for three or four years. Finley testified at trial that a few days before Nanette died, Hansen and Finley had a conversation wherein Hansen stated that "he was going to get [Nanette] out of the house if he had to kill her" and that "he would like to just beat the hell out of her."

¶90. Another of Hansen's neighbors, Mary Jensen, testified that the night before Nanette's memorial service, Mary and her husband were visiting Hansen. Mary testified that at one point in the evening when she was alone with Hansen, he said to her, "I killed her, but I don't remember it all."

¶91. In addition, Tim Hayes, a detention officer at the Mineral County jail where Hansen was incarcerated awaiting trial, testified to events that occurred on April 26, 1996, when he and Hansen were in Hansen's cell. After Hayes handed Hansen his eye drops, Hansen took the cap off the bottle, tipped his head back, lost his balance, and stumbled backward. When Hansen looked down, he gave a slight smile and told Hayes, "That is what I did when I stood on my wife's head." Hayes testified that Hansen did not appear to be joking, nor did Hayes take the statement as a joke.

¶92. Hansen's cellmate, David Ronemus, testified that, over a period of six weeks, he and Hansen had several conversations about Nanette's death. Ronemus testified that during one discussion, Hansen asked Ronemus what he thought of the situation. When Ronemus answered that he thought Hansen had killed Nanette, Hansen replied, "Yeah, I did it. So what? They still have to prove it."

¶93. Moreover, Jerry Parrick, Abe's best friend, testified that Abe had told him

several times that he hated Nanette with "an evil hate, vengeful evil hate." Parrick also testified that Abe told him, in Hansen's presence, that he had offered to kill Nanette for Hansen.

¶94.Having examined the totality of the circumstances, we hold that any error committed by the trial court in admitting Nanette's statements was not prejudicial to Hansen as this evidence was merely cumulative and, thus, the error was harmless beyond a reasonable doubt. *Carter*, 285 Mont. at 459, 948 P.2d at 1178-79.

## Conclusion

¶95.Although the District Court erred in admitting evidence of Nanette's out-of-court statements for the purpose of establishing the *corpus delicti*, that error was harmless. Furthermore, the terms *corpus delicti* and *res gestae* are vague and imprecise and have been misinterpreted and used incorrectly in the past. Therefore, we urge that these terms not be used in future. We suggest, instead, that the practicing bar and trial courts of this State rely on the clearer and more precise statements of the law, i. e., the Montana Code Annotated and the Montana Rules of Evidence, rather than vague Latin phrases that can easily be misinterpreted and misapplied. Indeed, henceforth, we will review claims of error in the admission of evidence as part of the *corpus delicti* or *res gestae* by determining whether the evidence was admissible under some provision of the Montana Code Annotated or under the Montana Rules of Evidence.

¶96.Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ J. A. TURNAGE

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER