DA 08-0107

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 27

STATE OF MONTANA,

        Plaintiff and Appellee,

   v.

JAMES DERBYSHIRE,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. BDC-2007-158
Honorable Julie Macek, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Jim Wheelis, Chief Appellate Defender, Joslyn Hunt, Assistant
Appellate Defender, Helena, Montana

        For Appellee:

            Hon. Steve Bullock, Montana Attorney General, Jonathan M. Krauss,
Assistant Attorney General, Helena, Montana

            Brant Light, Cascade County Attorney, Joel Thompson, Deputy County
Attorney, Great Falls, Montana

Submitted on Briefs:  December 3, 2008

Decided:  February 3, 2009

Filed:

_____
                    Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 James Derbyshire was convicted in the Eighth Judicial District Court, Cascade County, of one count of criminal possession of dangerous drugs (marijuana) with intent to distribute, a felony, in violation of § 45-9-103, MCA (2005). He appeals, arguing that the District Court erred in denying his pretrial motion to exclude evidence of his status as a probationer. We agree with Derbyshire and further conclude that the State has not demonstrated the error was harmless. We accordingly reverse Derbyshire's conviction, vacate the District Court's judgment, and remand this case for a new trial.

## BACKGROUND

¶2 As alleged in the State's probable-cause affidavit, federal and state officers executed a search of Derbyshire's residence and vehicle on March 7, 2007. Derbyshire was present during the search. The officers found three baggies of marijuana and a digital scale in his pickup and two baggies of marijuana in his jacket (which he was not wearing at the time). They also found some marijuana hidden in a bedroom ceiling tile. In sum, the officers allegedly found 639.46 grams of marijuana. The State further alleged that Derbyshire admitted he had been dealing marijuana since January 2007.

¶3 The case proceeded to trial on December 6, 2007. At a conference held that morning, the prosecutor informed the court that he would be calling a federal probation officer and a state probation officer as witnesses. Both officers had been involved in the search of Derbyshire's residence and vehicle. The prosecutor noted that he had instructed the officers not to discuss the reasons why Derbyshire was on probation, but he acknowledged that "certainly the fact that they are probation officers is going to get the

2

jury's ear." Thus, he stated he would not have a problem with the court's giving a cautionary instruction concerning evidence of prior bad acts.

¶4 Defense counsel objected, arguing that there should be "no reference at all to my client being on probation." Counsel pointed out that Derbyshire was not contesting the legality of the search, and he suggested that the witnesses could identify themselves as "officers" or "agents" of the State. But the prosecutor contended that it was impossible for the officers to testify without mentioning that they were "probation" officers. He explained that he intended to ask questions about their experience and their ability to identify the marijuana found during the search. Defense counsel replied that "they can do that without identifying that they're probation officers." Counsel suggested the officers could testify "that they work for the State, that they do searches all the time, that they're aware and been trained in what marijuana is, they know its smell, its appearance. I think that can all be done without going into the fact they are probation officers." Counsel also pointed out that identifying them as a federal probation officer and a state probation officer would imply that Derbyshire had been convicted of not just one, but two felonies.

¶5 The District Court ruled that the officers could identify themselves as "probation officers." The court reasoned that "the general rule is that if there is part of a transaction that involves probation officers that -- in which that is certainly the situation here then the State's not required to excise their evidence in order to put their case on trial." The court granted defense counsel's request for a continuing objection to such testimony.

¶6 After the jury was selected and preliminary instructions were given, but prior to the prosecutor's opening statement, the District Court (outside the jury's presence)

3

revisited the issue of "probation" references. The court inquired whether the prosecutor could present the State's evidence "without making reference to the fact that it was a probation search." The court also inquired whether the officers could testify simply "that they are, in fact, law enforcement officers, and that they conducted this search in that regard." The court suggested that redacting the references to Derbyshire's status as a probationer might be prudent so as to avoid "a legitimate issue of appeal."

¶7 The prosecutor, however, responded that "I'm perfectly comfortable with this going up on appeal as to the prejudice." He argued that it was necessary to identify the officers as "probation officers" in order to explain why and on what basis they searched Derbyshire's residence and vehicle, what steps they took in executing the search, how they determined that the substance they found was marijuana, and how they knew that Derbyshire was the only person living in the residence. He noted that he intended in his opening statement to tell the jury not to decide the case based on Derbyshire's status as a probationer, but he maintained that the fact the officers were "probation" officers conducting a "probation" search was admissible under the transaction rule (discussed below) because this evidence was inextricably linked to and explanatory of the search.

¶8 The District Court agreed, reasoning that "the involvement of the probation officer was part of the transaction of the whole investigation here." The court also reasoned that the officers' status as "probation officers" would be "relevant as to why they had certain knowledge" and "why they did certain things the way that they did." Thus, the court denied Derbyshire's motion to exclude "probation" references, though the court again granted defense counsel's request for a continuing objection to any such references. In

4

addition, recognizing that there was "an inherent prejudice" in identifying the witnesses as "probation officers" and Derbyshire as a "probationer," the court indicated that it would give the jury a cautionary instruction. In this regard, the prosecutor suggested that "a modification of the regular 404(b) instruction" would be sufficient (a reference to the jury instruction typically given when evidence is admitted under M. R. Evid. 404(b)).

¶9 The District Court then recalled the jury, and the prosecutor gave his opening statement. At the outset, he told the jury:

> On March 7, 2007, Great Falls Police Detective Rob Lopez, a narcotics investigator, was asked to assist in conducting a search of the residence of James Derbyshire, the defendant here today. Derbyshire at the time -- the reason for the search was that information had been received that Derbyshire was possibly involved in drugs. Derbyshire at the time was a probationer, and as such his residence was subjected to search on reasonable suspicion, less of a -- less of a requirement than those of us.
> And let me just be clear on something from the get-go. The State, the defense, and the Court are asking you to weigh this case based only on the evidence presented, and, in fact, you must do so, and not based in any way on this defendant's status as a probationer. I just want to make that very clear, and she'll instruct you on that as well.
> With that said I'll continue. . . .

The prosecutor then recounted the search of Derbyshire's residence and vehicle as well as the statements Derbyshire made to Detective Lopez. The prosecutor mentioned two of the probation officers (Jim Brills and Kevin Heiferman) a number of times, referring to them alternatively as "probation officers," "police officers," or simply "Officer Brills" and "Officer Heiferman."

¶10 The State called Detective Lopez as its first witness. Among other things, Lopez testified to the following. He was aware on the day of the search that Derbyshire was a "probationer." He discussed with "probation officers" whether Derbyshire was possibly

5

engaged in drug activity. He and "the probation office" agreed on how to proceed. They did not need a warrant to search Derbyshire's residence because he was a "probationer." The "probation officers" involved in the search "were two federal probation officers, Officer Antonson and Officer Heiferman and two state probation officers which would have been Officer Brills and Officer Hydes." Upon their arrival, Derbyshire came out of the residence because one of the "probation officers" had called him and asked him to come down to "the probation office" for a meeting. The "probation officers" conducted the search of the residence. The "probation officers" found an illegal substance. The "probation officers" gave Lopez the items they had found. While Lopez was interviewing Derbyshire, the "probation officers" were still at the residence conducting the search. When Lopez returned to the residence, the "probation officers" turned over additional drugs. It is pretty common for the police to assist with "probation searches."

¶11   Over the course of Lopez's testimony on direct examination (spanning 37 pages of a double-spaced transcript), "probation" appears 18 times. Notably, the word does not appear during his testimony on cross-examination. In addition, it is noteworthy that the prosecutor used the word far more often than Lopez. Indeed, Lopez generally referred to Antonson, Heiferman, Brills, and Hydes as "officers," not "probation officers."

¶12   At the conclusion of Lopez's testimony, the court gave the following instruction:

> The State has presented evidence that the Defendant was on probation at the time of the search, and this evidence has been submitted for the sole purpose of explaining the facts surrounding this search. The jury is prohibited from using this information to assume that somehow the Defendant is more likely to be guilty of this offense because he was on probation. He's to be judged on this offense based only upon the evidence that is submitted to you regarding this offense and that alone.

6

¶13    The State next called Officer Brills.  Brills testified that in his "work as a probation and parole officer, we do a lot of searches and end up finding a lot of paraphernalia and drugs."  He further testified that in conducting "probation searches," he had come across marijuana multiple times and, thus, was familiar with the odor and sight of the drug.  Turning to the search of Derbyshire's residence, Brills stated that he arrived with "state probation and parole officer Tim Hydes, federal probation and parole officer Ray Antonson and federal probation officer Kevin Heiferman, and Detective Rob Lopez, Great Falls PD."  Brills then described his search of the residence.

¶14    Over the course of Brills' testimony on direct and redirect examinations (spanning 15 pages), "probation" appears 16 times, almost exclusively in Brills' answers (as opposed to the prosecutor's questions).   It even seems that Brills went out of his way to use the word, as illustrated here:

> Q.    And did [Derbyshire] exit the residence?
> A.    He did.
> Q.    And what happened when he did?
> A.    He was detained by Officer -- federal probation and parole officer Heiferman and federal probation and parole officer Antonson as well as Detective Rob Lopez.  Probation and parole officer Hydes and myself came across the street.  We parked across the street.

Similarly, on redirect, Brills testified:

> Q.    Mr. Brills, was that dropped ceiling throughout the house, or was it only in the defendant's bedroom?
> A.    No, it was also a drop ceiling in the living room and I believe Officer Hydes and -- probation officer Hydes and federal probation officer Antonson were looking in the ceiling tile above the ceiling tile in the living room.

Brills also used "probation" twice during cross-examination.

¶15 Officer Heiferman's testimony is not quite as saturated with the word "probation," though it does appear eight times in the first two pages of the direct examination where Heiferman discusses his occupation and prior experience and identifies "[m]yself, another federal probation officer, Ray Antonson, state probation officers Jim Brills and Tim Hydes" as the persons who were present at the search of Derbyshire's residence. All in all, the prosecutor and the State's three witnesses used the term "probation" (or some form of the word, such as "probationer") 44 times.

¶16 The State and the defense both rested on the first day of trial. The following morning, prior to closing arguments, the District Court read the jury a number of instructions, including Instruction No. 10, which stated as follows:

> The State has presented evidence that the Defendant was on probation at the time of the search. This evidence was introduced for the sole purpose to explain the facts surrounding the search. The jury is prohibited from using this information to assume that the Defendant is more likely to be guilty of this offense. He is to be judged on this offense based only on the evidence regarding this offense alone.

¶17 The jury returned a verdict of guilty. Thereafter, the District Court sentenced Derbyshire to the Montana State Prison for a term of 20 years, with no time suspended. Derbyshire now appeals.

**ISSUES**

¶18 We address two issues on appeal:

1. Did the District Court err in denying Derbyshire's motion to exclude evidence of his status as a probationer?

2. If so, has the State demonstrated that the error was harmless?

8

## STANDARD OF REVIEW

¶19 A trial court has broad discretion in determining the relevance and admissibility of evidence. *State v. Hicks*, 2006 MT 71, ¶ 19, 331 Mont. 471, 133 P.3d 206. Thus, as a general rule, we review a trial court's evidentiary rulings for abuse of discretion. *State v. McOmber*, 2007 MT 340, ¶ 10, 340 Mont. 262, 173 P.3d 690. A court abuses its discretion if it acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *McOmber*, ¶ 10. In exercising its discretion, however, the trial court is bound by the Rules of Evidence or applicable statutes. Thus, to the extent the court's ruling is based on an interpretation of an evidentiary rule or statute, our review is de novo. *See State v. Mizenko*, 2006 MT 11, ¶ 8, 330 Mont. 299, 127 P.3d 458 ("We review a district court's conclusions of law and interpretations of the Constitution or the rules of evidence, *de novo*."); *State v. Incashola*, 1998 MT 184, ¶ 9, 289 Mont. 399, 961 P.2d 745 ("Where, as here, a discretionary ruling is based on a conclusion of law, we review that conclusion to determine whether the court correctly interpreted the law."); *State v. Weaver*, 2008 MT 86, ¶ 10, 342 Mont. 196, 179 P.3d 534 ("The interpretation and construction of a statute is a matter of law, which we review de novo.").

## DISCUSSION

¶20 ***Issue 1. Did the District Court err in denying Derbyshire's motion to exclude evidence of his status as a probationer?***

¶21 We begin with the undisputed proposition that evidence of Derbyshire's status as a probationer constitutes evidence that he has committed other crimes, which is generally

inadmissible. *See State v. Bain*, 176 Mont. 23, 29, 575 P.2d 919, 923 (1978) ("As a general rule, evidence of a separate or collateral crime is not admissible."); *State v. Tiedemann*, 139 Mont. 237, 242, 362 P.2d 529, 531 (1961) ("Proof that [the] accused committed other crimes, even if they were of like nature to that charged, is not admissible to show his depravity or criminal propensities, or the resultant likelihood of his committing the offense charged; nor may such evidence be offered if it only tends to create a prejudice against the accused in the minds of the jury."); *Michelson v. United States*, 335 U.S. 469, 475, 69 S. Ct. 213, 218 (1948) ("The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime."); *cf. State v. West*, 245 Mont. 298, 301-02, 800 P.2d 1047, 1049-50 (1990).

¶22 One of the dangers in admitting such evidence is that the jury will " 'prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge.' " *State v. Gowan*, 2000 MT 277, ¶ 19, 302 Mont. 127, 13 P.3d 376 (quoting *Michelson*, 335 U.S. at 476, 69 S. Ct. at 218). A defendant must not be convicted "merely because he is an unsavory person," *Gowan*, ¶ 19, or on the rationale that because he committed a crime in the past, he has a defect of character that makes him more likely than people generally to have committed the charged offense, *see State v. Medina*, 245 Mont. 25, 28, 798 P.2d 1032, 1034 (1990), *overruled in part on other grounds, State v. Olson*, 286 Mont. 364, 373, 951 P.2d 571, 577 (1997). Accordingly, we have said that the general rule barring proof of other crimes "should be strictly enforced in all cases

10

where applicable, because of the prejudicial effect and injustice of such evidence, and should not be departed from except under conditions which clearly justify such a departure. The exceptions should be carefully limited, and their number and scope not increased." *Tiedemann*, 139 Mont. at 242-43, 362 P.2d at 531.

### Rule 404(b)

¶23 In this connection, M. R. Evid. 404(b) states that while evidence of other crimes, wrongs, or acts "is not admissible to prove the character of a person in order to show action in conformity therewith," it "may . . . be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The admission of evidence under Rule 404(b), however, requires compliance with four substantive and three procedural criteria first announced in *State v. Just*, 184 Mont. 262, 269, 274, 602 P.2d 957, 961, 963-64 (1979), and subsequently modified in *State v. Matt*, 249 Mont. 136, 142-43, 814 P.2d 52, 56 (1991). These criteria are known as the Modified *Just* Rule. *See Matt*, 249 Mont. at 142, 814 P.2d at 56.

¶24 Derbyshire contends that evidence of his status as a probationer does not meet the substantive criteria of the Modified *Just* Rule. We need not address that issue, however, because Derbyshire also points out, correctly, that the State did not comply with all of the procedural criteria of the Rule. Specifically, evidence of other crimes, wrongs or acts "may not be received unless there has been written notice to the defendant that such evidence is to be introduced." *Matt*, 249 Mont. at 142, 814 P.2d at 56. The notice must "specify the evidence of other crimes, wrongs or acts to be admitted, and the specific Rule 404(b) purpose or purposes for which it is to be admitted." *Matt*, 249 Mont. at

142-43, 814 P.2d at 56; *see also* § 46-13-109, MCA. In the present case, the State did not provide such notice. Thus, evidence of Derbyshire's status as a probationer was not admissible under Rule 404(b) and *Matt*.

**Section 26-1-103, MCA**

¶25 Instead, as discussed above, the State invoked the transaction rule as grounds for allowing its witnesses to identify themselves as "probation" officers conducting a "probation" search of the home and vehicle of a "probationer." Under the transaction rule, "[w]here the declaration, act, or omission forms part of a transaction which is itself the fact in dispute or evidence of that fact, such declaration, act, or omission is evidence as part of the transaction." Section 26-1-103, MCA. The admission of evidence under the transaction rule is not subject to the substantive and procedural requirements of the Modified *Just* Rule. *See State v. Buck*, 2006 MT 81, ¶¶ 75-76, 331 Mont. 517, 134 P.3d 53. We thus have characterized the transaction rule as an "exception" to the Modified *Just* Rule. *See e.g. Buck*, ¶ 75; *State v. Marshall*, 2007 MT 198, ¶ 16, 338 Mont. 395, 165 P.3d 1129; *State v. Gittens*, 2008 MT 55, ¶ 36, 341 Mont. 450, 178 P.3d 91.

¶26 The District Court agreed with the State's theory, reasoning that "the involvement of the probation officer was part of the transaction of the whole investigation here" and that the officers' status as "probation officers" would be "relevant as to why they had certain knowledge" and "why they did certain things the way that they did." Derbyshire, however, contends that the District Court erred in this respect. He argues that the "fact in dispute" at his trial was whether he possessed a dangerous drug with intent to distribute. *See* § 45-9-103(1), MCA. He suggests that evidence of this fact would include whether

12

he possessed a dangerous drug and whether he had intent to distribute it. But the specific roles and titles of the officers who gathered evidence, Derbyshire asserts, had no consequence on the ultimate issue of whether he possessed a dangerous drug with intent to distribute.

¶27 The State responds that it "needed to explain how police came to understand certain facts—i.e., that Derbyshire 'was possibly engaged in drug activity' . . . and that Derbyshire lived alone." Moreover, the State claims it "was necessary for the officers who conducted the probation search to establish their knowledge and ability to recognize marijuana," it also "was necessary to explain to the jury why the police and probation officers were there and why they were allowed to be there," and there was "a need to differentiate" the roles of the probation officers from the role of Detective Lopez. The State contends that the only way to accomplish these purposes was to have the officers identify themselves as "probation officers" and testify that Derbyshire was "on probation and under their supervision in their capacities as probation officers." According to the State, such testimony was admissible under the transaction rule. We disagree.

¶28 First, there is an undertone in the State's arguments, both here and in the District Court, that the "probation" references were properly allowed because they were "needed" and "necessary." The criterion, however, is "admissibility," not "need" or "necessity," and evidence which is otherwise inadmissible in a criminal trial does not become admissible merely by showing that the evidence is "needed" or "necessary." Rather, the State (or the defendant, as the case may be) must cite and comply with authority—e.g., a statute or rule of evidence—which allows the evidence in question to be admitted.

13

¶29 That being said, the transaction rule, as noted, states that "[w]here the declaration, act, or omission forms part of a transaction which is itself the fact in dispute or evidence of that fact, such declaration, act, or omission is evidence as part of the transaction." Section 26-1-103, MCA. "Admissibility under the transaction rule is predicated on the jury's right to hear what transgressed immediately prior and subsequent to the commission of the offense charged, so that they may evaluate the evidence in the context in which the criminal act occurred." *State v. Detonancour*, 2001 MT 213, ¶ 29, 306 Mont. 389, 34 P.3d 487 (internal quotation marks omitted). Here, the fact in dispute was whether Derbyshire possessed a dangerous drug (marijuana) with intent to distribute. Section 45-9-103(1), MCA. The officers' status as "probation" officers and Derbyshire's status as a "probationer" are neither part of nor evidence of this disputed fact. Nor are they evidence of what transgressed immediately prior and subsequent to the commission of the offense charged.

¶30 Indeed, the prosecutor did not offer the officers' status as "probation" officers and Derbyshire's status as a "probationer" in order to prove specifically that Derbyshire possessed marijuana with intent to distribute. Rather, he candidly offered this evidence to establish the circumstances surrounding the search. Accordingly, at the conclusion of Lopez's testimony, the District Court instructed the jury: "The State has presented evidence that the Defendant was on probation at the time of the search, and this evidence has been submitted for the sole purpose of explaining the facts surrounding this search." (Instruction No. 10 was to the same effect.) The search, however, was not a fact in dispute. Consequently, § 26-1-103, MCA, was not a ground for admitting this evidence.

14

**"Inextricably Linked To and Explanatory Of"**

¶31   The State does not contend that the "probation" references were "part of a transaction which is itself the fact in dispute or evidence of that fact." Section 26-1-103, MCA. Rather, the State identifies in our caselaw several alternative standards of varying stringency for admitting evidence under the transaction rule. In *State v. Wing*, 264 Mont. 215, 870 P.2d 1368 (1994), for example, we stated that evidence which "tends to explain circumstances surrounding the charged offense" is relevant, probative, and competent, and we associated this standard with § 26-1-103, MCA. *See Wing*, 264 Mont. at 224-25, 870 P.2d at 1374. In *State v. Lozon*, 2004 MT 34, 320 Mont. 26, 85 P.3d 753, we stated that evidence is admissible under the transaction rule if it is "inextricably linked to, and explanatory of, the charged offense," and we again associated this standard with § 26-1-103, MCA. *See Lozon*, ¶¶ 11-12. Notably, we also used the phrases "inseparably related to the alleged criminal act" and "not wholly independent or unrelated to the charged offense." *Lozon*, ¶ 12. The former requires that the evidence fall within narrow parameters (be "inseparably related"), while the latter requires that the evidence not fall outside broad parameters (not be "wholly independent or unrelated"). In any event, based on these standards, the State suggests that evidence of a defendant's probationary status is admissible under the transaction rule if it is "inextricably linked to the circumstances surrounding the crimes charged." The State observes that we agreed with this contention on the facts of *State v. Bauer*, 2002 MT 7, 308 Mont. 99, 39 P.3d 689.

¶32   In considering the State's argument, we first note that the standards discussed in the preceding paragraph evolved from this Court's jurisprudence under the doctrines of

corpus delicti and res gestae. *See e.g. State v. Hayworth*, 1998 MT 158, ¶ 31, 289 Mont. 433, 964 P.2d 1 ("Under the concept of *corpus delicti*, '[e]vidence of acts which are inextricably or inseparably linked with the crime charged is admissible without regard to the rules governing "other crimes" evidence.' " (brackets in *Hayworth*)); *Wing*, 264 Mont. at 224, 870 P.2d at 1374 ("The concepts embraced by the term *res gestae* are included within the codification of that common law doctrine in § 26-1-103, MCA, also referred to as the 'transaction' rule."); *State v. Moore*, 254 Mont. 241, 245, 836 P.2d 604, 607 (1992) ("The alleged acts of the defendant occurring after the alleged crime was committed are also inseparably related to the alleged criminal act, as part of the res gestae or corpus delicti of the crime, and therefore are not subject to the restriction of 'other crimes' evidence."). Tracing the standards back even further, it appears they originated in this Court's pre-Rule 404(b) "other crimes" jurisprudence. *See e.g. State v. Riley*, 199 Mont. 413, 425-26, 649 P.2d 1273, 1279 (1982); *State v. Jackson*, 180 Mont. 195, 201-02, 589 P.2d 1009, 1014 (1979); *State v. Frates*, 160 Mont. 431, 436-37, 503 P.2d 47, 50 (1972); *State v. Jensen*, 153 Mont. 233, 238, 455 P.2d 631, 633-34 (1969); *State v. Merritt*, 138 Mont. 546, 548-49, 357 P.2d 683, 684 (1960).

¶33    In *State v. Hansen*, 1999 MT 253, 296 Mont. 282, 989 P.2d 338, however, we rejected the notion that evidence of matters closely related to and explanatory of the charged offense is part of the corpus delicti of the crime. *See Hansen*, ¶¶ 27-69. We also abandoned the doctrine of res gestae. *See Hansen*, ¶¶ 72-84. We stated that we will, "instead, use the specific rule of evidence or statute that applies to the particular factual situation presented" to determine the admissibility of the evidence at issue. *Hansen*, ¶ 81.

16

In the present case, the specific rule of evidence or statute that applies to the particular factual situation presented is § 26-1-103, MCA. Yet, in spite of our decision in *Hansen*, we have not addressed whether the standards previously recognized under the doctrines of corpus delicti and res gestae and associated with the transaction rule in *Wing*, *Lozon*, *Hayworth*, and other cases are correct interpretations of § 26-1-103, MCA. Nevertheless, while it may be necessary to resolve this question in a future case, we need not do so here. For the reasons which follow, we reject the State's argument that evidence of the officers' status as "probation" officers and Derbyshire's status as a "probationer" was "inextricably linked to the circumstances surrounding the crime charged." As noted, the State identifies several purposes for such evidence. We address each one in turn.

¶34 First, the State contends that it "needed to explain how police came to understand . . . that Derbyshire 'was possibly engaged in drug activity' indicating a reasonable basis to search his home." Along these same lines, the State contends that it had "to present evidence that the officers were authorized to search Derbyshire, his house, and his truck without a warrant" because "it was necessary to explain to the jury why the police and probation officers were there and why they were allowed to be there." Yet, the lawfulness of the search is not an element of the crime charged, and the officers' authority to conduct the search is not inextricably linked to Derbyshire's alleged possession of marijuana with intent to distribute. Notably, as the State acknowledges, Derbyshire never challenged the legality of the search. But even if he had, that was not a matter for the jury to decide. Finally, even assuming, arguendo, that the State needed to establish the legality of the search, Derbyshire points out that the officers could have

17

testified they had reason to believe he possessed marijuana based on information they had received from reliable sources. The jury did not need to know that the officers learned this information because Derbyshire was on probation and under their supervision. For that matter, the prosecutor could have requested an instruction from the court that the lawfulness of the search was not at issue, and the officers could have testified simply that they found marijuana in Derbyshire's residence and pickup.

¶35 Second, the State contends that it needed to establish that Derbyshire lived alone in order to "cement[ ] the allegation that Derbyshire, and not someone else, possessed the marijuana found in his house." Yet, the officers did not have to identify themselves as "probation officers" in order to establish that Derbyshire lived alone. Indeed, the prosecutor's questioning of Officer Brills illustrates this point:

> Q. And just lastly, did you find any indications in the defendant's house that he was -- that anybody else was living there?
> A. No indication whatsoever.
> Q. No personal property of anybody else, no mail of anybody else, no clothes of anybody else?
> [DEFENSE COUNSEL]: I think it's beyond the scope of cross-examination, Judge.
> THE COURT: Overruled. Go ahead.
> THE WITNESS: There was no indication that anyone else lived there.
> [PROSECUTOR]: All right. Thank you, sir.

Similarly, the prosecutor questioned Officer Heiferman as follows:

> Q. Mr. Heiferman, was there any indication from the room that that room was occupied by anyone else besides the Defendant?
> A. No, no other indication.
> Q. Was there any indication in the rest of the room that you observed that anybody else was living there?
> A. No.
> [THE PROSECUTOR]: No more questions. Thank you, sir.

18

¶36 Third, the State contends that "it was necessary for the officers who conducted the probation search to establish their knowledge and ability to recognize marijuana." The State fails to explain, however, why it was necessary in this connection to identify the officers specifically as "probation officers." The State asserts that the officers gained their knowledge and ability to recognize marijuana through training and experience. Yet, the State offers no reason why they could not have testified to that effect (i.e., that they are federal/state officers who have been trained to recognize marijuana or have the ability to do so through prior experience) without identifying themselves as "probation officers." This point aside, the State's argument fails on a more fundamental ground. As the State proposes to use the evidence, the officers' status as "probation officers" is explanatory of *their knowledge and ability to recognize marijuana*. That, however, is not the purpose of the transaction rule. To be admissible, the evidence must be explanatory of *the charged offense* (i.e., of Derbyshire's alleged possession of the drug with intent to distribute).

¶37 Fourth, the State contends that "in the context of a probation search supported by law enforcement, there is a need to differentiate the roles of the probation officers—to conduct the search—and the roles of the police—to secure the suspect, premises, and any evidence seized." For the reasons discussed above, however, the individual roles played by the officers conducting the search are not inextricably linked to Derbyshire's alleged possession of marijuana with intent to distribute. Nor is it necessary to identify the officers' job titles in order to explain what they did during the search of his residence and vehicle—the legality of which is not an issue, in any event.

19

¶38 Lastly, we address the State's reliance on *State v. Bauer*, 2002 MT 7, 308 Mont. 99, 39 P.3d 689. In that case, the defendant (Bauer) was charged with two counts of incest and one count of unlawful transactions with children. *Bauer*, ¶ 13. The district court ruled that the fact of Bauer's lengthy prior prison internment and his status as a probationer when he visited the victim (Amanda) in Anaconda were admissible as part of the transaction. *Bauer*, ¶ 20. In reviewing this ruling, we observed that in order for the jury to understand the context of the alleged incest, Amanda needed to explain that she had not seen or known Bauer because he had been incarcerated since she was a small child. Moreover, we noted that Bauer had used his prison sentence to silence Amanda by telling her that he would be returned to prison and either die or commit suicide there if she spoke about the incest. Finally, Bauer was required, as a condition of probation, to apply for permission to travel, and the travel permits were presented at trial to show that Bauer had falsified the forms to conceal his intention to stay with Amanda when visiting Anaconda. *See Bauer*, ¶ 23. On these facts, we agreed with the State that Bauer's history of imprisonment and his probationary status when he visited Amanda in Anaconda were inextricably linked to the circumstances surrounding the crimes charged. *Bauer*, ¶ 22; *see also State v. Brasda*, 2003 MT 374, ¶¶ 23-24, 319 Mont. 146, 82 P.3d 922.

¶39 Analogizing to *Bauer*, the State asserts that the jury needed "to understand the context of Derbyshire's possession of marijuana with intent to distribute." The State does not explain why this is so, but regardless of that fact, we conclude that the State's analogy is unavailing. The officers here could have testified, without identifying themselves as "probation officers," that they found marijuana in Derbyshire's pickup, bedroom ceiling

tile, and jacket. Such testimony would have established the "context" of his possession. Thus, whereas Bauer's probationary status was inextricably linked to the context of his visits with Amanda, Derbyshire's probationary status was not inextricably linked to the context of his alleged possession of marijuana.

¶40 Based on the foregoing discussion, and in light of the State's arguments in this Court and in the District Court, it appears that the prosecution simply wanted the jury to know that Derbyshire was on state and federal probation when he committed the charged offense. Derbyshire, however, may not be convicted based on the inference that because he committed crimes in the past, he is more likely to have committed the one charged here. *Gowan*, ¶ 19; *Medina*, 245 Mont. at 28, 798 P.2d at 1034; *Tiedemann*, 139 Mont. at 242, 362 P.2d at 531.

**Conclusion**

¶41 The District Court admitted the evidence in question "for the sole purpose of explaining the facts surrounding this search." The transaction rule, however, allows the admission of evidence of "the fact in dispute" under § 26-1-103, MCA, or evidence of matters that are inextricably linked to and explanatory of "the charged offense" under the alternative standards set forth in our caselaw. The search was neither a fact in dispute nor an element of the charged offense. Thus, the transaction rule was not a basis for allowing the officers to identify themselves as "probation officers" and to testify that Derbyshire was "on probation." We hold that the District Court erred in denying Derbyshire's motion to exclude evidence of his status as a probationer. Given this conclusion, we now consider whether the State has demonstrated that the error was harmless.

¶42   *Issue 2.  Has the State demonstrated that the error was harmless?*

¶43   A cause may not be reversed by reason of any error committed by the trial court against the convicted person unless the record shows that the error was prejudicial. Section 46-20-701(1), MCA.  In *State v. Van Kirk*, 2001 MT 184, 306 Mont. 215, 32 P.3d 735, we articulated the analytical framework for determining whether an error prejudiced the convicted person's right to a fair trial and is, therefore, reversible. *Van Kirk*, ¶ 37.

**Step One**

¶44   The first step in the *Van Kirk* analysis is to determine whether the error is structural error or trial error.  *Van Kirk*, ¶ 37.  Structural error is the type of error that affects the framework within which the trial proceeds.  *Van Kirk*, ¶ 38.  It typically is of constitutional dimensions, precedes the trial, and undermines the fairness of the entire trial proceeding.  *Van Kirk*, ¶ 38.  Given its nature, structural error cannot be qualitatively weighed against the admissible evidence introduced at trial.  *Van Kirk*, ¶ 38.  As a result, structural error is not subject to harmless error review.  *Van Kirk*, ¶ 38.  Rather, it is automatically reversible, and no additional analysis or review is required.  *Van Kirk*, ¶ 39. Trial error, by contrast, is the type of error that typically occurs during the presentation of a case to the jury.  *Van Kirk*, ¶ 40.  Trial error can be reviewed qualitatively for prejudice relative to other evidence introduced at trial.  *Van Kirk*, ¶ 40.  Thus, trial error is not presumptively prejudicial, is not automatically reversible, and is subject to harmless error review.  *Van Kirk*, ¶ 40.

¶45   Derbyshire contends that the error here was structural because it "undermined the entire trial framework, given that it set the stage for what the officers could say time and

22

time again." He further argues that the error "did not occur during the presentation of the case. Rather, it established how the case would be presented." Yet, under this reasoning, every erroneous ruling on a motion in limine would constitute structural error because the ruling would "set the stage" for what happens at trial. This approach would dramatically expand the concept of "structural error."

¶46 Structural errors are defects in the constitution of the trial mechanism which infect and contaminate the framework within which the trial proceeds. *See State v. Matt*, 2008 MT 444, ¶ 32, 347 Mont. 530, ___ P.3d ___. Examples include lack of an impartial trial judge, total deprivation of the right to counsel, conflict of interest in representation throughout the entire proceeding, the right to self-representation at trial, the right to a public trial, unlawful exclusion of grand jurors of the defendant's race, and an erroneous reasonable-doubt instruction to the jury. *See Matt*, ¶ 31; *Van Kirk*, ¶ 39; *State v. LaMere*, 2000 MT 45, ¶ 23, 298 Mont. 358, 2 P.3d 204. We cannot agree with Derbyshire that the error here contaminated the trial mechanism along the lines that a biased judge, lack of counsel, or a jury-selection error would. Although the District Court made its ruling prior to trial, the errors ultimately occurred during the presentation of the case each time the court (despite Derbyshire's pretrial motion and his continuing objection) allowed the officers to testify that they were "probation officers" and that Derbyshire was "on probation." We conclude, therefore, that the error was trial error.

**Step Two**

¶47 The second step in the *Van Kirk* analysis is to determine under the cumulative evidence test whether the trial error was harmless. *Van Kirk*, ¶¶ 41, 43; *State v. Peplow*,

23

2001 MT 253, ¶¶ 46-47, 307 Mont. 172, 36 P.3d 922. The first question under this test is whether the tainted evidence was admitted to prove an element of the offense. *See Peplow*, ¶ 49. Next, if the tainted evidence was admitted to prove an element of the offense, then the State must direct us to admissible evidence that proves the same facts as the tainted evidence and demonstrate that the quality of the tainted evidence was such that there was no reasonable possibility it might have contributed to the conviction. *Peplow*, ¶ 49; *Van Kirk*, ¶¶ 44-45. But if the tainted evidence was not admitted to prove an element of the offense, then the admission of the evidence will be deemed harmless only if the State demonstrates that the quality of the tainted evidence was such that there was no reasonable possibility it might have contributed to the conviction. *Peplow*, ¶¶ 49, 51; *Van Kirk*, ¶¶ 46, 47; *accord State v. McOmber*, 2007 MT 340, ¶ 26, 340 Mont. 262, 173 P.3d 690.

¶48   Applying this test, we first observe that "a person commits the offense of criminal possession with intent to distribute if the person possesses with intent to distribute any dangerous drug as defined in 50-32-101." Section 45-9-103(1), MCA (2005). Marijuana is a dangerous drug. *See* §§ 50-32-101(6), -222(4)(t), MCA. The facts that the officers were "probation officers" and that Derbyshire was "on probation" are not elements of this offense. Accordingly, the tainted evidence was not admitted to prove an element of the offense. Thus, the admission of the evidence will be deemed harmless only if the State demonstrates that the quality of the tainted evidence was such that there was no reasonable possibility it might have contributed to Derbyshire's conviction.

24

¶49     The State contends that Derbyshire has objected to only "the officers' titles as federal and state probation officers" and not the "substantive probation search evidence." Thus, according to the State, the error here was harmless because other evidence, to which Derbyshire purportedly did not object, proved the same fact as did the tainted evidence (namely, that he was on probation). This argument is without merit. Defense counsel asserted that there should be "*no reference at all* to my client being on probation" (emphasis added), and Derbyshire has maintained that position on appeal.

¶50     Alternatively, citing *State v. Long*, 2005 MT 130, ¶ 27, 327 Mont. 238, 113 P.3d 290, the State argues that "the inherent prejudice in mentioning Derbyshire's probation and identifying witnesses as his probation officers" was cured by the District Court's two cautionary instructions and the prosecutor's command during his opening statement that "you [must] weigh this case based only on the evidence presented . . . and not based in any way on this defendant's status as a probationer." We are not persuaded.

¶51     For one thing, we explained in *State v. Croteau*, 248 Mont. 403, 407, 812 P.2d 1251, 1253 (1991), and again in *State v. Ray*, 267 Mont. 128, 133-34, 882 P.2d 1013, 1016 (1994), that evidence of other crimes, wrongs, or acts must, as a general rule, be excluded because "prior acts or crimes are highly prejudicial to the defendant, and usually irrelevant for purposes of the charged crime." Evidence of a defendant's prior acts or uncharged misconduct creates the risk that the jury will penalize him simply for his past bad character, *Croteau*, 248 Mont. at 407-08, 812 P.2d at 1253; *Ray*, 267 Mont. at 134, 882 P.2d at 1016, or prejudge him and deny him a fair opportunity to defend against the particular crime charged, *State v. Gowan*, 2000 MT 277, ¶ 19, 302 Mont. 127,

25

13 P.3d 376. Therefore, in terms of quality, the tainted evidence here was highly prejudicial.

¶52 To make matters worse, the prosecutor and the State's three witnesses managed to incorporate this highly prejudicial evidence into their respective questions and answers 44 times. *Long*, therefore, is clearly distinguishable. That case involved a single, unsolicited statement by a witness to which there was a contemporaneous objection followed by a curative instruction. *See Long*, ¶¶ 16-27. By contrast, the present case involves numerous (and apparently deliberate) uses of the word "probation" which, by virtue of its repetition, is one of the most conspicuous aspects of the trial transcript.

¶53 We hold that there is a reasonable possibility the admission of the tainted evidence might have contributed to Derbyshire's conviction and that the State, therefore, has not demonstrated that the error was harmless.

¶54 The Dissent asserts that our analysis "goes astray." Dissent, ¶ 58. The Dissent does not dispute that the admission of the "probation" references was error. Rather, the Dissent argues that the error was harmless because the State presented "truly overwhelming" and "unassailable" evidence of Derbyshire's guilt. Dissent, ¶¶ 58, 62, 63. In *Van Kirk*, however, we categorically rejected this "overwhelming evidence" approach, under which a court simply tallies the admissible evidence of guilt to determine whether, quantitatively, it is sufficiently "overwhelming." We stated that the *quality* of the tainted evidence (more specifically, the qualitative impact the tainted evidence might have had on the fact-finder), not the *quantity* of the admissible evidence, is the proper focus when determining whether trial error was harmless. *See Van Kirk*, ¶¶ 34-36, 43. To that end,

26

the State must show that, *qualitatively*, there is no reasonable possibility the tainted evidence might have contributed to the defendant's conviction. *See Van Kirk*, ¶¶ 44, 46. And for the reasons discussed above, we conclude that the State has not made this showing in the present case.

## CONCLUSION

¶55  Testimony by the State's witnesses that they were "probation officers" and that Derbyshire was "on probation" was not admissible under Rule 404(b) or the transaction rule. Thus, the District Court erred in denying Derbyshire's motion to exclude evidence of his status as a probationer. The State has not demonstrated that this error was harmless. We accordingly reverse Derbyshire's conviction, vacate the District Court's judgment, and remand this case for a new trial.

¶56  Reversed and remanded for a new trial.

/S/ JAMES C. NELSON

We Concur:

/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS

Justice John Warner dissents.

¶57  I dissent. I agree with the Court that it would have been better to grant Derbyshire's motion to exclude the fact that he was on probation. Derbyshire made no challenge to the search of his person or his residence, and the State had ample evidence

27

that he lived alone. Thus, the fact that it was probation officers who authorized and conducted the search did not tend to prove that a fact of consequence was more or less probable. Thus, the "probation" designation is irrelevant. M. R. Evid. 401. However, any error was clearly harmless.

¶58 Citing *Peplow* and *VanKirk*, the Court notes at ¶ 47 that the erroneous admission of evidence is harmless if the State demonstrates that the quality of the tainted evidence does not raise the reasonable possibility that such evidence contributed to the defendant's conviction. *VanKirk* was decided in 2001. In later cases, the Court has specifically considered the strength of the evidence against the defendant, as well as the prejudicial effect of the testimony and whether a cautionary jury instruction could cure any prejudice, in making its determination whether a particular error was harmless. *State v. Long*, 2005 MT 130, ¶ 24, 327 Mont. 238, 113 P.3d 290; *State v. White*, 2008 MT 129, ¶ 15, 343 Mont. 66, 184 P.3d 1008. In this case, the Court should, but does not, consider that the evidence against Derbyshire is truly overwhelming. *See White*, ¶ 15. This, in my opinion, is where the Court goes astray.

¶59 The charge is criminal possession of drugs with the intent to distribute. As was noted by the District Court, the allegations are straightforward. There was a probation search. A digital scale and 639.46 grams of marijuana were found on Derbyshire's person and in his home. Derbyshire made admissions to the officers that he was in possession of the marijuana. There was no evidence indicating that the marijuana was for Derbyshire's personal use.

28

¶60     Prior to trial, Derbyshire advised the District Court that what he wanted was a plea bargain, but the State's offer was for too much prison time. So, no agreement had been reached and he decided to go to trial.

¶61     At the beginning of his opening statement the prosecutor told the jury that Derbyshire was on probation and immediately commanded the jury not to take this fact into account in determining his guilt. Then, four witnesses testified that Derbyshire had possession of a digital scale, marijuana on his person and a large supply of marijuana in his residence where he lived alone. Derbyshire waived his opportunity to make an opening statement and presented no witnesses. The District Court twice instructed the jury that it was not to consider the fact that he was on probation.

¶62     The State's evidence was simple, straightforward, and clearly showed Derbyshire was guilty as charged. In his closing argument, defense counsel admitted to the jury that none of the evidence was controverted and that the State had proven that Derbyshire was in possession of at least 60 grams of marijuana. The only defense argument offered was that since all of the evidence seized had not been tested by the state crime laboratory, the State had not proved that it was all marijuana, and thus asked for a misdemeanor conviction. However, all of the leafy plant material in evidence, part of which was admittedly marijuana, was before the jury to look at, smell and compare with that part of the evidence which had been tested. In short, the jury was presented with unassailable evidence that Derbyshire had been caught red-handed in possession of a very large amount of contraband, he admitted such possession, he had a scale to weigh it for sale,

there was no evidence that the marijuana was for his personal use, and he presented no viable argument that he was not guilty as charged.

¶63 I conclude that considering the overwhelming evidence of guilt, along with the admonition of the prosecutor and the cautionary instructions of the District Court, there is no reasonable possibility that the admission of the irrelevant fact that Derbyshire was on probation had anything at all to do with his conviction. I dissent.

/S/ JOHN WARNER